[Nos. F006263 and F006487. Fifth Dist. Sept. 24, 1987.]

MICHELLE CUBIT et al., Plaintiffs and Appellants, v. RIDGECREST COMMUNITY HOSPITAL et al., Defendants and Respondents.

COUNSEL

Anderson, Parkinson, Weinberg & Miller, Thomas T. Anderson, De Goff & Sherman, Victoria J. De Goff and Richard Sherman for Plaintiffs and Appellants.

Clifford, Jenkins & Brown, John R. Szewczyk, Bauer, Harris & McEvoy, John Patrick McEvoy, Ann G. Diener, Horvitz, Levy & Amerian, Peter Abrahams, Frederic D. Cohen, McGahan & Engle and Marsha Rutenbar for Defendants and Respondents.

## OPINION

**BEST, J.**—Plaintiffs appeal from a judgment dismissing their complaint pursuant to Code of Civil Procedure section 583, subdivision (a) (discretionary dismissal for failure to bring the action to trial within two years).[1] Plaintiffs contend the trial court abused its discretion in dismissing their complaint. We agree and reverse the judgment.

### FACTS

Arthel Cubit died on January 20, 1980, survived by his wife and 12 children who are the plaintiffs in this action. On January 19, 1981, plaintiffs filed a medical malpractice action in Kern County Superior Court against, among others, defendant Ridgecrest Community Hospital (Ridgecrest), defendants Drummond Medical Group, Inc., Dr. Ralph J. Langsjoen, Dr. Richard P. Karoll, and Dr. Vernon Shull (Drummond defendants), and defendant Dr. M. M. Clark.

Arthel Cubit had been hospitalized at Ridgecrest once in December 1979 and released. He was then readmitted on January 9, 1980, with a fever and jaundice and was diagnosed as having type A hepatitis. Cubit's consulting and treating physicians while at Ridgecrest, defendants Langsjoen and Shull and Dr. D. P. Welcome, diagnosed Cubit as having type A hepatitis, although the lab tests never confirmed it. Within 24 hours of Cubit's death on January 20, 1980, Dr. Langsjoen ordered an autopsy. Langsjoen testified in his deposition that he ordered an autopsy so quickly because he suspected that Cubit's problems may have been caused by some toxic substance.

Dr. Karoll, a pathologist, performed the first autopsy on Cubit's body. At the time Dr. Karoll performed the autopsy, he did not suspect there was a toxic cause to Cubit's disease process and did no toxicological studies. Dr. Karoll only had in mind that the clinicians at the hospital believed Cubit had died from hepatitis. Dr. Karoll determined that Cubit died because of acute hepatic necrosis of undetermined etiology. Basically, this means Cubit

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

Section 583, subdivision (a), will hereafter be referred to as section 583(a). Effective January 1, 1985, section 583(a) was repealed and replaced by section 583.110 et seq. but the provisions of section 583(a) govern this appeal. (See § 583.160.)

died because his liver was diseased and failed, but Dr. Karoll could not determine what caused the liver to become diseased in the first place. Dr. Karoll testified in his deposition that based on the autopsy, he could not rule out the possibility that Cubit had type A hepatitis as diagnosed by Cubit's treating physicians, but the acute nature of Cubit's liver failure and the devastating nature of his disease were not consistent with type A hepatitis.

Dr. Karoll also stated that he took tissue samples of all of Cubit's organs and made microscopic slides to study. He did not, however, keep any hair for analysis. Dr. Karoll further testified he removed the liver from Cubit's body during the autopsy but did not recall if he replaced it. If the liver was not replaced, it would have been pulverized or incinerated.

Because there was still suspicion that Cubit had died from exposure to a toxic substance (Cubit had been employed by the Kerr-McGee chemical plant), his body was turned over to the Kern County Coroner's office. On January 28, 1980, Dr. Ambrosecchia of the Kern County Coroner's office performed a second autopsy on Cubit's body. Dr. Ambrosecchia also concluded that Cubit had died due to liver failure, but he was equally unable to determine the cause.

Dr. Ambrosecchia testified in his deposition that he had a difficult time making any findings in his examination because not only had the body already been autopsied and the organs cut up, but the body had been embalmed by a mortuary. He testified that embalming changes the appearance of the organs, and in the process, powder is placed into body cavities making it difficult to find and identify specific tissues. He could not take sections of organs and preserve them himself because the organs had already been dissected. Basically, in his autopsy, he merely examined the tissue slides made by Dr. Karoll and apparently examined some liver sections that were sent by Dr. Karoll. (It is not clear whether Dr. Ambrosecchia examined the slides, the tissue samples or both.) Dr. Ambrosecchia also stated he was unable to do any toxicology studies because there was no blood or urine left with which to perform any such studies.

Although this autopsy was performed on January 28, 1980, Dr. Ambrosecchia's final determination from his studies was not reached until March 1980.

On March 27, 1980, William Kropach, an attorney, filed a workers' compensation claim against the Kerr-McGee Chemical Corporation in San Bernardino County on behalf of Cubit's heirs, plaintiffs in this case. The claim, which was filed before plaintiffs had any information from Cubit's

hospital records or Dr. Ambrosecchia's autopsy, was based on the allegation that Cubit had died due to exposure to a toxic substance at work. On April 2, 1980, Kropach received a copy of Cubit's hospital records. The records appeared to affirm plaintiffs' belief that Cubit had been poisoned through work. Dr. Welcome reported in the records that Cubit's rapid downhill course indicated some sort of toxic reaction. Plaintiffs thereafter began pursuing their workers' compensation claim against Kerr-McGee in San Bernardino County.

On January 19, 1981, plaintiffs filed a complaint against defendants for medical malpractice to toll the statute of limitations.[2] Plaintiffs had not yet received a copy of the coroner's autopsy report, although the report was requested as early as February 1980. While plaintiffs were pursuing their claim against Kerr-McGee, they also were attempting to procure the autopsy report from the Kern County Coroner's office. Kropach wrote to the Kern County Coroner's office on February 20, 1981, on July 29, 1981, and on February 15, 1982, to inquire about the report. Plaintiffs were only able to get the information by subpoenaing Dr. Ambrosecchia and taking his deposition on August 20, 1982.

On August 12, October 4 and October 12, 1982, plaintiffs consulted with Dr. Reuben Merliss. Dr. Merliss reviewed Cubit's hospital records and the autopsy reports of Drs. Ambrosecchia and Karoll. Dr. Merliss submitted three reports indicating that the initial autopsy performed by Dr. Karoll may have ruined chances of accurately determining the actual cause of death. Dr. Merliss also rendered the emphatic opinion that Cubit's death must have been caused by some toxic chemical at the Kerr-McGee plant.

On or about December 29, 1982, plaintiffs associated in the law firm of Thomas T. Anderson on the medical malpractice case in Kern County. On January 5, 1983, plaintiffs retained Dr. Lowell Somers, who reviewed the hospital records and doctors' reports regarding Cubit's stay at Ridgecrest. It was his opinion that Cubit probably died from a toxic substance rather than hepatitis type A.

On March 18, 1983, Dr. Somers and Don Manton, an investigator for the Anderson law firm, went to Ridgecrest to interview several witnesses. They learned from Dan Stubbert of the embalming practices of Hall & Lyons Mortuary and also learned of the first autopsy performed by Dr. Karoll.

On March 30, 1983, plaintiffs received information from Dr. Robert Weissman, hired by the Kerr-McGee chemical plant, that in his opinion,

---

[2] On the same day, plaintiffs filed a wrongful death action in the San Bernardino County Superior Court against Kerr-McGee, Dr. Karoll and Ridgecrest alleging, among other things, that Mr. Cubit was exposed to toxic chemicals at his place of employment.

Cubit's death was not caused or hastened in any way due to his prior employment at Kerr-McGee.

On April 18, 1983, the Anderson law firm obtained a set of employment records of Mr. Cubit.

On July 6, 1983, Dr. Rene Modglin, working for plaintiffs, called Dr. Karoll requesting that Dr. Karoll turn over the slides made at the first autopsy. Dr. Modglin was informed he could not have the slides without a court order.

On August 26, 1983, plaintiffs obtained the expert consultation of Dr. Frederick Meyers to attempt to determine what agent caused the death of Cubit's liver. After reviewing Cubit's hospital records, the autopsy reports, and considering Cubit's employment in an industrial setting, Dr. Meyers opined that the agent was some type of toxin and possibly some form of chlorinated hydrocarbon.

On August 29, 1983, plaintiffs received in the workers' compensation case copies of the entire employment file of Cubit. Mr. Kropach then on or about October 17, 1983, noticed the taking of the depositions of Dr. Karoll and several employees of Kerr-McGee chemical plant, including Dr. Clark. On November 17, 1983, the depositions of Kerr-McGee employees Arzell Hall and Manuel Mata were taken in connection with the workers' compensation claim. Also on this date, Dr. Karoll's deposition was taken. Dr. Somers attended this deposition.

On November 29, 1983, plaintiffs received a copy of a report from yet another medical expert they had retained, Dr. William Metzger. Dr. Metzger informed Dr. Somers that upon reviewing Cubit's hospital records, Cubit had been placed on an around-the-clock regimen of Tylenol DS, despite all indications that Cubit had a hepatic dysfunction. In an impaired liver, Tylenol acts as a toxin, which causes hepatic necrosis. Metzger opined that whatever the initial cause of the liver dysfunction, the ill-advised use of large doses of Tylenol on the patient played a significant role in the progressive hepatic necrosis and significantly lessened the patient's chances of survival.

Plaintiffs' first amended complaint for medical malpractice and intentional spoilage of evidence was filed on December 20, 1983, and served on defendants on or about December 21, 1983.

Also on or about December 21, 1983, Don Manton, Anderson's investigator, picked up from Dr. Karoll microscopic slides of Cubit's tissue pre-

pared at the first autopsy. Then, about the same time, Dr. Karoll called Dr. Somers and the Anderson law firm and informed them that he remembered he had preserved wet tissue samples of Cubit's organs and had given these to the Kern County Coroner's office. These samples were finally located at the coroner's office and turned over to Dr. Somers on February 3, 1984.

Dr. Somers kept the samples until February 9, 1984, at which time he delivered the jar of tissue samples, slides and paraffin blocks to Dr. Rene Modglin. At Dr. Modglin's office Somers removed a portion of the wet tissue and placed it in a second jar with part of the fluid. The second jar was transported to Dr. Joseph Graas in San Diego, who eventually reported the presence of arsenic in Cubit's liver. Dr. Modglin apparently never tested the wet tissue samples. Dr. Somers states in a declaration that these wet tissue samples are still available for testing and are preserved in the same jar and fluid in which they were originally packaged. In a subsequent deposition Somers testified about how he divided the tissue samples. Dr. Somers first washed and dried a pair of tweezers, a scalpel and a specimen jar. He next took out a piece of liver tissue, cut it up, put it in the specimen jar and put some fluid in the jar. Dr. Somers was concerned about contaminating the tissue, so he washed and dried the instruments he used. However, he did not specifically request an arsenic-free container from the woman at Dr. Modglin's office who was assisting him. He assumed the woman at Dr. Modglin's office was helping him to divide the tissue and package it appropriately.

Dr. Somers also declares that it is plaintiffs' contention that defendants were negligent in prescribing Tylenol, which caused massive hepatic necrosis. Furthermore, when the liver dies, its basic architecture is destroyed, and a histological examination of the liver tissue will reveal nothing relevant to Tylenol toxication. Somers further declared the embalming process would have precluded any determination of the toxic levels of Tylenol and Tylenol metabolites.

In the year 1984, the majority of work done on this medical malpractice case by plaintiffs involved responding to various defendants' demurrers to the complaint. On January 19, 1984, the Drummond defendants filed a demurrer to plaintiffs' first amended complaint. Plaintiffs filed their opposition to the motion on February 22, 1984. On February 28, 1984, the demurrer was overruled in part, but was sustained on the ground that the complaint failed to state facts sufficient to constitute a cause of action for punitive damages. Plaintiffs sought punitive damages on their cause of action which alleged defendants intentionally destroyed evidence consisting of Cubit's body tissues during the autopsy, such that it became impossible for plaintiffs to determine exactly what caused Cubit's liver to become diseased.

Plaintiffs filed their second amended complaint on April 16, 1984. The Drummond defendants filed a demurrer to this complaint on June 4, 1984. The trial court's order sustaining defendants' second demurrer on the same grounds as the first was filed July 11, 1984.

Plaintiffs' third amended complaint was filed July 26, 1984. On September 10, 1984, the Drummond defendants again demurred to the complaint and submitted a motion to strike portions of the complaint. Plaintiffs filed opposing papers to the demurrer on September 27, 1984. Defendants responded with rebuttal papers filed October 3, 1984. On October 9, 1984, the trial court granted the Drummond defendants' motion to strike the allegations for punitive damages.

The Drummond defendants then filed their answer to plaintiffs' third amended complaint on December 17, 1984. Defendants Ridgecrest and Dr. Clark had filed their answers previously on September 4, 1984, and September 18, 1984.

Plaintiffs also were attempting to discover the actual toxin responsible for Cubit's initial liver disease during this period. Hence, they had Dr. Somers procure the wet liver tissue samples from the Kern County Coroner's office in February 1984 and give these samples to both Dr. Modglin and Dr. Graas for analysis. Dr. Graas's analysis indicating the presence of arsenic was not received by plaintiffs until June 4, 1984.

Also, further discovery in this case was conducted, although not necessarily instigated by plaintiffs. On April 17, 1984, the Drummond defendants participated in the taking of the deposition of Martha Cubit, the wife of the deceased.

On April 25, 1984, the Drummond defendants served on plaintiffs a request for the production of documents and "any and all tissue blocks and/or tissue slides pertaining to the autopsy performed on decedent, Arthel Gertie Cubit, which are in the possession of plaintiffs and/or plaintiffs' attorneys." The documents requested were the deposition transcripts of Dr. Ambrosecchia, Manuel Mata and Arzell Hall, the signed statement by Dan Stubbert, and duplicate prints of five photographs taken at the Kerr-McGee plant. These were all items described in plaintiff Martha Cubit's answers to interrogatories served on April 6, 1984.

Plaintiffs responded to this request on May 21, 1984. They provided all documents requested. However, plaintiffs stated they would not produce the tissue blocks and tissue slides, as they were still being identified and tested by plaintiffs. Plus, plaintiffs asked that when the tissue blocks and slides

were produced in the future all parties agree on a single expert to test the samples because of the small amount of tissue remaining. On December 5, 1984, the Drummond defendants requested that plaintiffs make slides of the remaining tissue so all defendants could individually test the samples, but plaintiffs did not respond to this request.

On April 6, May 21 and June 6, 1984, plaintiffs responded to interrogatories served upon them by defendants Clark and former defendant Dr. Green.

On December 14, 1984, plaintiffs sent interrogatories to Kerr-McGee in connection with the action filed in San Bernardino County.

In 1985 the following proceedings took place in the prosecution of this case. On February 8, February 18, March 26 and March 27, 1985, Dr. Somers's deposition was taken in connection with the case against Kerr-McGee in San Bernardino County. However, the attorney for defendant Ridgecrest was present at the deposition. Also, plaintiffs' attorney states in his declaration that he believes copies of the deposition, as well as approximately 50 exhibits provided at this time, were made available to the attorneys for the Drummond defendants.

Also, in January 1985 the Anderson law firm undertook an epidemiological survey of the Town of Trona, which is where the Kerr-McGee plant is located.

On February 28, 1985 (the declaration indicates 1984, but this appears to be a typographical error), plaintiffs filed a statement of damages in the medical malpractice action.

On May 20, 1985, plaintiffs filed an at issue memorandum. It is not clear why, but the trial court informed plaintiffs the case was not at issue. On May 28, 1985, the Drummond defendants filed a counter at issue memorandum.

On June 7, 1985, plaintiffs served interrogatories on defendants Dr. Langsjoen, Dr. Shull and Ridgecrest. Thereafter, on June 14, 1985, plaintiffs served interrogatories on defendant Dr. Clark. Plaintiffs also noticed the deposition of defendants Dr. Clark, Dr. Shull, Dr. Welcome and Joan Wood. On June 24 and 25, 1985, the depositions of 10 of Cubit's 12 children were taken. On June 25, 1985, plaintiffs responded to a request for admissions and interrogatories served on them by the Drummond defendants.

On June 17, 1985, plaintiffs filed a notice and motion to specially set the case for trial to avoid mandatory dismissal under section 583, subdivision

(b). The Drummond defendants then filed a notice and motion to dismiss under the two-year discretionary dismissal statute found in section 583(a) on June 20, 1985.

On June 25, 1985, plaintiffs filed an amended at issue memorandum, dismissing at the same time named defendants Trona Medical Clinic, Dr. Peter Noce, Dr. James Peters and Dr. Kenneth Lyons.

On July 1, 1985, plaintiffs took the deposition of Dr. Langsjoen.

Extensive papers in support of and in opposition to the motion to dismiss were filed by plaintiffs and the Drummond defendants in July 1985. On July 9, 1985, defendant Clark joined in the motion to dismiss. Further opposition papers to this joinder motion were filed by plaintiffs on July 15, 1985.

The Drummond defendants and defendant Clark's motion to dismiss was granted by the trial court on July 22, 1985, on the ground of lack of due prosecution and delay which had prejudiced the defendants. Defendant Ridgecrest filed a separate motion to dismiss under section 583(a) on August 15, 1985. This motion was granted on September 24, 1985.

In the motion for reconsideration of the Drummond defendants' successful motion for dismissal, plaintiffs provided information that on June 19, 1985, the Kern County Coroner's office exhumed the remains of Cubit. Plaintiffs, the Kern County Coroner's office and Kerr-McGee all took samples of Cubit's hair, fingernails and thigh tissue. After testing these samples, the Kern County Coroner's office concluded that Cubit did not die from a toxic substance, such as arsenic.

Discussion

I

*Did the trial court abuse its discretion in granting the defendants' motions to dismiss?*

■  Plaintiffs appeal from judgments of dismissal in favor of the Drummond defendants, defendant Ridgecrest and defendant Clark. The trial court dismissed the action against the Drummond defendants and defendant Clark on the grounds of lack of due prosecution and prejudice to defendants resulting from the delay. The trial court's order dismissing the action against defendant Ridgecrest states only that the action was dismissed for lack of prosecution. Although a trial court's decision to dismiss an action pursuant to section 583(a) may only be reversed on appeal if the

trial court clearly abused its discretion, plaintiffs have demonstrated a clear abuse of discretion in this case.

Each defendant on appeal argues that plaintiffs failed to demonstrate good cause for the delay in prosecution and that actual prejudice was suffered as a result of this delay. First, the Drummond defendants point out that plaintiffs' motion to specially set the case for trial was brought four and one-half years after their complaint was filed on January 19, 1981. They further point out that plaintiffs did not serve defendants until three years after the complaint was filed. Defendants argue these delays are not excused because of the fact that plaintiffs did not obtain the medical opinion concerning the involvement of Tylenol in Cubit's death until November 29, 1983. The Drummond defendants state, "There can be no excuse for waiting almost three years to obtain an expert medical opinion in an action for medical malpractice." Defendants further argue that the fact that plaintiffs may have conducted discovery in connection with the San Bernardino County actions is irrelevant for purposes of showing diligence in prosecuting the present medical malpractice case in Kern County. Also, defendants note that prior to the motion to dismiss, plaintiffs had propounded only one set of interrogatories and noticed the depositions of various medical personnel; however, defendants note these efforts were not made until four and one-half years after the original complaint was filed. Defendants also argue that plaintiffs' efforts in defending the demurrers to the complaint do not constitute a justifiable excuse for the delay in bringing the case to trial.

The Drummond defendants argue that not only have plaintiffs failed to excuse the delay in prosecution, but defendants have demonstrated actual prejudice from the delay. Defendants first argue that Dr. Somers destroyed the chain of custody of the liver tissue taken at the time of Cubit's first autopsy. Dr. Somers did this when he divided the liver tissue at Dr. Modglin's office and sent a portion of it to Dr. Graas for analysis. Furthermore, the tissue had been misplaced for one year. Defendants also argue that they are prejudiced because Dr. Ambrosecchia died before they were served with the complaint. Defendants assert they were never able to question Dr. Ambrosecchia with regard to his autopsy findings in relation to plaintiffs' allegations of negligence. Finally, defendants argue they were prejudiced because on December 21, 1983, Dr. Karoll released to plaintiffs 27 microscopic slides and 22 tissue blocks. Plaintiffs have presently refused to release these items to defendants and have had a full year to examine the items, while defendants have had no such opportunity.

Defendant Ridgecrest also argues the dismissal was appropriate due to inexcusable delay and actual prejudice suffered by defendant. Defendant first contends plaintiffs have completely failed to explain their most serious

delay in prosecution, that is the almost three-year delay between the filing of the complaint on January 19, 1981, and the service of the complaint on defendant on December 21, 1983. Defendant contends the failure to discover the role of Tylenol in the case until November 1983 was inexcusable given plaintiffs' assertion that the prescribing of Tylenol was universally recognized as hazardous at the time of Cubit's death. Defendant also claims that plaintiffs have completely failed to explain the delay in service, given that plaintiffs had knowledge of their claim for intentional spoilage of evidence as early as August 1982. Defendant Ridgecrest further argues plaintiffs may not argue their delay in prosecution was excused because of efforts they made in investigating their actions in San Bernardino County. Also, plaintiffs did not pursue any recognizable actions of prosecution, namely discovery, until four and one-half years after the complaint was filed, and plaintiffs' responses to discovery conducted by defendant are irrelevant as factors to show plaintiffs' own diligent prosecution.

Defendant Ridgecrest also argues it suffered inherent prejudice due to the delay in service in the form of the loss of witnesses and diminished memories. In addition to presumed prejudice, defendant Ridgecrest claims actual prejudice. Defendant alleges it has lost the opportunity to question Dr. Ambrosecchia. It has lost the ability to test the only remaining samples of Cubit's liver due to plaintiffs' mishandling of the evidence. Also, plaintiffs have denied access to other tissue slides prepared by Dr. Karoll in their possession. Defendant Ridgecrest further contends it has lost specific witnesses to the incident. Defendant's attorney and an administrator of the hospital declare that 19 individuals who were involved in Cubit's care at the hospital are no longer employed by the hospital and are difficult to locate.

Defendant Clark adopts the arguments of inexcusable delay and prejudice set out in the other defendants' appellate briefs. In addition, Clark argues plaintiffs have failed to address how the court's dismissal was an abuse of discretion as to his case. He points to the fact that plaintiffs' argument on appeal involves a theory that is only applicable to plaintiffs' case against other defendants, the treating physicians and pathologist at Ridgecrest. Dr. Clark, on the other hand, treated Cubit several months prior to his death when Cubit and Dr. Clark were working for Kerr-McGee chemical plant.

Plaintiffs' argument, of course, is that they did demonstrate due diligence in prosecuting the case and that defendants actually have not suffered any prejudice due to any delay that has occurred in the case. Plaintiffs argue that their complaint against all defendants is that defendants were negligent in treating Cubit with Tylenol in the face of evidence that he was suffering from an impaired liver. Plaintiffs explained that the delay between the filing

of the complaint and service was due to the fact that they did not discover this aspect of negligence until November 29, 1983, when they obtained the opinion of Dr. William Metzger. They further argue that they demonstrated diligent prosecution in the action after defendants were served with the complaint in that they spent a considerable amount of time defending the complaint against numerous demurrers by the defendants, participated in discovery in the case instigated by defendants, and spent time in the prosecution of their actions in San Bernardino County. Plaintiffs further argue that defendants' claims of prejudice were not supported by any facts and that this court should not presume prejudice in favor of the defendants.

Section 583(a) provides: "The court, in its discretion, . . . may dismiss an action for want of prosecution pursuant to this subdivision if it is not brought to trial within two years after it was filed. The procedure for obtaining such dismissal shall be in accordance with rules adopted by the Judicial Council." California Rules of Court, rule 373(e) (formerly rule 203.5(e)) provides numerous factors a trial court must consider in determining whether an action should be dismissed. (See *United Farm Workers National Union* v. *International Brotherhood of Teamsters* (1978) 87 Cal.App.3d 225, 233 [150 Cal.Rptr. 761].)

In reviewing a trial court's decision to grant a dismissal under section 583(a), this court must ask whether the trial court abused its discretion. The Supreme Court recently affirmed this standard of review in *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58]: "When the trial court has ruled on such a motion, ' "unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]; accord, *Martindale* v. *Superior Court* (1970) 2 Cal.3d 568, 574 [86 Cal.Rptr. 71, 468 P.2d 199].) ' "The burden is on the party complaining to establish an abuse of discretion . . . ." ' (*Denham* v. *Superior Court, supra,* at p. 566.)"

Several Courts of Appeal, including this court, have stated that the trial court's decision to grant a dismissal motion should be given closer scrutiny than a decision to deny the dismissal. (*Luti* v. *Graco, Inc.* (1985) 170 Cal.App.3d 228, 232 [215 Cal.Rptr. 902]; *Visco* v. *Abatti* (1983) 144 Cal.App.3d 904, 909 [192 Cal.Rptr. 833]; *United Farm Workers National Union* v. *International Brotherhood of Teamsters, supra,* 87 Cal.App.3d 225.) In fact, one Court of Appeal has held recently that when the trial court dismisses an action under section 583(a), the reviewing court analyzes that decision as a question of law subject to plenary appellate scrutiny. (*Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019,

1026-1027 [213 Cal.Rptr. 712].) To the extent that *Hurtado* suggests a standard of review that is not an abuse-of-discretion standard, we are compelled to disagree because of the Supreme Court's affirmance of the abuse-of-discretion standard in *Blank* v. *Kirwan,* which was decided after the *Hurtado* case.

In reviewing a trial court's decision to grant a dismissal, the several competing policies underlying section 583(a) should be weighed. The policy under section 583, stated generally, is to compel reasonable diligence in the prosecution of lawsuits. (*Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 332; *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]; *Jensen* v. *Western Pac. R. R. Co.* (1961) 189 Cal.App.2d 593, 596 [11 Cal.Rptr. 444].) Due diligence in prosecuting lawsuits is required in order to "promote the trial of cases before evidence is lost, destroyed, or the memory of witnesses becomes dimmed." (*General Motors Corp.* v. *Superior Court* (1966) 65 Cal.2d 88, 91 [52 Cal.Rptr. 460, 416 P.2d 492].) Some courts also have held one of the purposes of section 583(a) is to expedite the administration of justice to benefit the litigant as well as the general public. (*Innovest, Inc.* v. *Bruckner* (1981) 122 Cal.App.3d 594, 599 [176 Cal.Rptr. 90]; *Lopez* v. *Larson* (1979) 91 Cal.App.3d 383, 400 [153 Cal.Rptr. 912]; contra, *Hurtado* v. *Statewide Home Loan Co., supra,* 167 Cal.App.3d at p. 1029.) Balanced against this policy to promote diligent prosecution is the policy which seeks to dispose of litigation on the merits rather than on procedural grounds. The Supreme Court in *Denham* held the policy of disposing of actions on their merits is more powerful than the policy seeking to promote prompt prosecution. (*Denham* v. *Superior Court, supra,* 2 Cal.3d at p. 566; see also *Wilson* v. *Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 562 [194 Cal.Rptr. 773, 669 P.2d 9].)

■ Numerous courts, including the Supreme Court, have noted that the burden of demonstrating a dismissal is warranted is on the defendant. (*Hocharian* v. *Superior Court* (1981) 28 Cal.3d 714, 723, fn. 7 [170 Cal.Rptr. 790, 621 P.2d 829]; *Farrant* v. *Casas de la Senda Homeowners Assn.* (1985) 170 Cal.App.3d 221, 226 [216 Cal.Rptr. 27]; *Visco* v. *Abatti, supra,* 144 Cal.App.3d at p. 908.) However, plaintiff does have the burden of showing that delay in prosecution was justified or excusable. (*Wilson* v. *Sunshine Meat & Liquor Co., supra,* 34 Cal.3d at pp. 562-563; *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 418 [134 Cal.Rptr. 402, 556 P.2d 764]; *Luti* v. *Graco, Inc., supra,* 170 Cal.App.3d at p. 232; *Corlett* v. *Gordon* (1980) 106 Cal.App.3d 1005, 1012-1013 [165 Cal.Rptr. 524].) Also, as the delay between filing of the complaint and the motion to dismiss increases from two years to five, "the showing required to excuse a failure to bring a case to trial grows greater and greater." (*Id.* at p. 1013; *Lowe* v. *Thomas* (1970) 11 Cal.App.3d 867, 869-871 [90 Cal.Rptr. 202].) Furthermore,

where the plaintiff fails to make a sufficient showing of excusable delay, the trial court does not abuse its discretion in granting defendant's motion to dismiss. (*Blank* v. *Kirwan, supra,* 39 Cal.3d at pp. 331-332; *Wilson* v. *Sunshine Meat & Liquor Co., supra,* 34 Cal.3d at pp. 562-563; *Sanborn* v. *Chronicle Pub. Co., supra,* 18 Cal.3d at p. 418.) As stated recently by the Supreme Court, the policy of disposing of litigation on the merits does not prevail unless the plaintiff makes some showing of excusable delay. (*Salas* v. *Sears, Roebuck & Co.* (1986) 42 Cal.3d 342, 347 [228 Cal.Rptr. 504, 721 P.2d 590].)

### A. *Plaintiffs have demonstrated excusable delay.*

■ Plaintiffs' theory on the complaint against defendants is that defendants were negligent in treating Cubit with Tylenol in the face of his impaired liver. Plaintiffs did not discover this aspect of negligence until November 29, 1983, when they received the opinion of Dr. William Metzger. This is not a case in which plaintiffs failed for three years to seek a medical opinion on Cubit's care at the hospital. They were attempting to determine the cause of Cubit's death during this time period. It took until August 20, 1982, despite diligent efforts, to get the autopsy report from the Kern County Coroner's office. Then, the opinions of Dr. Reuben Merliss were obtained in August and October of 1982, which indicated Cubit's death was toxin-related and probably due to chemicals to which he was exposed at the Kerr-McGee plant. Subsequently, in January 1983, Dr. Lowell Somers was consulted, and his opinion, which was based on a review of all records including hospital records, only indicated that a toxin was the cause of Cubit's death. The same limited opinion was given by Dr. Frederick Meyers on August 26, 1983. It was not until November 29, 1983, that a fourth medical expert, Dr. Metzger, pointed out the role that Tylenol played in Cubit's death. Defendants then were served three weeks later.

After defendants were served, a year and one-half period transpired before plaintiffs brought their motion to specially set the case for trial. Plaintiffs also were required to show that during this time, they diligently prosecuted their action. (*White* v. *Mortgage Finance Corp.* (1983) 142 Cal.App.3d 770, 774 [191 Cal.Rptr. 277].) Between January 1984 and December 1984, plaintiffs' complaint was demurred to three times. Each demurrer was both vigorously prosecuted and opposed, although plaintiffs ultimately lost the battle and were required to strike from their complaint all allegations for punitive damages. Also, during this period of time, defendants instigated discovery in the case. On April 17, the Drummond defendants participated in taking the deposition of Martha Cubit. Plaintiffs' attorney was present at this deposition. On April 6, May 21 and June 6, 1984, plaintiffs responded to interrogatories served upon them by defendant Dr. Clark and former

defendant Dr. Green. Also, on May 21, 1984, plaintiffs responded to a request for production of documents served on them by the Drummond defendants.

In *Farrant* v. *Casas de la Senda Homeowners Assn., supra,* 170 Cal.App.3d at page 226, the Court of Appeal rejected as proof of due diligence assertions that plaintiff filed three amended complaints in response to a judgment on the pleadings, demurrers and motions to strike. The opinion implies that only affirmative acts on the part of the plaintiff will justify a delay in bringing a case to trial. However, where a defendant takes affirmative action in the case through attacks on the pleadings or discovery, plaintiff certainly must meet these actions and defend against them or participate in them. This undoubtedly takes time on the part of plaintiff, and these efforts do move the case forward. Plaintiffs in the present case vigorously opposed the demurrers and motions to strike filed by defendants and diligently responded to and participated in all discovery proceedings in the case. We do not believe plaintiffs should be faulted for participating in discovery in a responsive rather than affirmative manner. Furthermore, California Rules of Court, rule 373(e) provides that in ruling on the motion, the court shall consider the diligence of *the parties* in pursuing discovery or other pretrial proceedings. *The parties* in this case were diligent in pursuing discovery and other pretrial proceedings during 1984.

Also, on February 8, February 18, March 26 and March 27, 1985, one of plaintiffs' key medical experts, Lowell Somers, gave deposition testimony in the Kerr-McGee case in San Bernardino County. One Court of Appeal has held that each case should be treated distinctly for purposes of a motion to dismiss, and discovery in one case should not be used to justify delay in another case. (*Rodde* v. *Trousdale Constr. Co.* (1969) 276 Cal. App.2d 419, 423 [80 Cal.Rptr. 774].) However, in this case Dr. Somers's depositions were attended by defendant Ridgecrest's attorney, and the 50 plus exhibits provided at these depositions, plus copies of the depositions, were made available to the attorneys of the other defendants. Also, on February 28, 1985, plaintiffs filed a statement of damages in the case. On June 7, 1985, plaintiffs served interrogatories on defendants Dr. Langsjoen, Dr. Shull and defendant Ridgecrest, and on June 14, 1985, plaintiffs served interrogatories on defendant Clark and noticed the depositions of Dr. Clark, Dr. Shull, Dr. Welcome and Joan Wood.

In our view, plaintiffs demonstrated sufficient cause for the one significant delay in this case, the three years between the filing and service of the complaint, and then diligently prosecuted the case in the one and one-half years following service of the complaint. Plaintiffs did not know of the significance of the Tylenol treatment until November 29, 1983, and this lack

of knowledge was reasonable under the circumstances of the case. Furthermore, between December 1983 and June 1985, plaintiffs were not idle, but defended against three demurrers to their complaint and participated in and responded to extensive discovery instigated by defendants. It also should be noted that after plaintiffs' motion to specially set the case for trial and defendants' motions to dismiss were filed, plaintiffs took the deposition of Dr. Langsjoen, responded to further interrogatories served by the Drummond defendants, and attended the depositions of 10 of Cubit's 12 children.

If a plaintiff demonstrates good cause for the delay in prosecution, some cases have held it is an abuse of discretion to dismiss the case. (See *Lowe* v. *Thomas, supra,* 11 Cal.App.3d at p. 869.) However, it is clear that a court must consider the totality of circumstances of the case in order to exercise its discretion properly in determining whether to dismiss a case under section 583(a). (See *Salas* v. *Sears, Roebuck & Co., supra,* 42 Cal.3d at p. 346; Cal. Rules of Court, rule 373(e).) Hence, we must examine defendants' claims of prejudice before determining whether the trial court abused its discretion in dismissing the case.

B. *Defendants have not demonstrated prejudice resulting from any delays in this case.*

Defendants first claim they are prejudiced because plaintiffs broke the chain of custody of the wet tissue samples. Apparently from the initial autopsy, there were microscopic slides made of Cubit's bodily tissues. Also, Dr. Karoll saved actual pieces of the liver preserved in some sort of formaldehyde. These wet tissue samples were sent to the coroner's office by Dr. Karoll. They were finally discovered there by plaintiffs through Dr. Somers. Dr. Somers declared that he retrieved the tissue samples from the coroner's office on February 3, 1984. Then, on February 9, 1984, he delivered the samples to Dr. Modglin's office. At the office he and a woman who worked in Dr. Modglin's office divided the liver sample. Somers stated he took a pair of tweezers, scalpel and specimen jar and washed and dried all three items. He then cut a piece of the liver and put it in the specimen jar with some of the fluid. He then delivered the second jar personally to Dr. Graas in San Diego. The original sample at Dr. Modglin's office was apparently never tested. Dr. Modglin's office did misplace the jar for approximately one year. Dr. Somers retrieved the jar in 1985. It is Dr. Somers's declaration that the sample that he received from Dr. Modglin is in the same condition as it was when he picked it up from the coroner's office in 1984.

Defendants' contention that they can no longer use the liver sample for testing purposes because the chain of custody has been broken and the sample may have been contaminated is not supported by the record. First,

the defendants introduced no medical evidence to support this contention of contamination. Second, there is no evidence that someone other than Dr. Modglin had the sample and tampered with it in the year it was misplaced. Third, any contention that the sample is contaminated is purely speculative. Dr. Somers did state he did not specifically ask for an arsenic-free specimen jar at Dr. Modglin's office. However, he declared he washed each tool that came in contact with the liver sample. Defendants have not presented any evidence that this procedure was not adequate to insure that the sample was kept uncontaminated by some substance such as arsenic.

Furthermore, it is plaintiffs' assertion that their case against defendants rests on the theory that defendants negligently administered Tylenol to Cubit. Dr. Somers declared that the severe damage to the liver due to the progression of the necrosis would make it virtually impossible to detect the presence of any Tylenol toxins in the liver tissue after death. Furthermore, the defendants certainly have their hospital records and their own memories to aid them in determining the simple question of whether or not they prescribed Tylenol for Cubit's treatment. The question of whether Tylenol treatment under the progression of Cubit's disease as manifested to the doctors while Cubit was alive was negligent is not something that appears to be based on an examination of Cubit's destroyed liver after death. Defendants gave no explanation and present no evidence to the contrary.

Defendants also claim they are prejudiced because Dr. Ambrosecchia is now dead. Dr. Ambrosecchia's deposition was taken on August 20, 1982, in the workers' compensation case. Plaintiffs were hoping to glean some information from the coroner's autopsy as to what caused Cubit's death. Ambrosecchia's autopsy and report, however, were little more than a parrot of Dr. Karoll's autopsy, at least as to the cause of death. Dr. Ambrosecchia concurred that acute hepatic necrosis caused Cubit's liver to fail, which in turn caused kidney failure and heart failure. However, he could not determine what caused the necrosis of the liver in the first instance and, hence, could not say that it was not type A hepatitis as diagnosed by Cubit's treating physicians.

Given plaintiffs' theory of their case against defendants, it is difficult to see how the lack of Dr. Ambrosecchia's cross-examination would prejudice the defense. The defense will most certainly involve countering the allegations that prescribing Tylenol to a person with an impaired liver would not have constituted negligent treatment. Defendants surely would have been able to employ an expert who could examine Cubit's condition as evidenced in the hospital records and determine if the treatment as evidenced in those hospital records was justified or adequate.

Defendants also claim that they were prejudiced because plaintiffs have not allowed them to have access to the slides and tissue blocks prepared by Dr. Karoll at the time of the autopsy. This does not appear to constitute evidence that would prejudice defendants' ability to defend their case. Defendants do not contend the slides or tissue blocks have been tampered with. The slides apparently are in their original state, and any favorable evidence to defendants' case is certainly still contained in them. Defendants need only obtain possession of the slides and perform their analysis on them prior to trial. If plaintiffs persist in refusing to allow defendants to examine the slides, then defendants could move to compel the production of the slides. The remedy for plaintiffs' reluctance to give up possession of the slides should not take the form of a dismissal of their complaint.

Finally, defendant Ridgecrest contends that 19 witnesses to Cubit's care and treatment at the hospital are no longer available. David Mechtenberg, the administrator of Ridgecrest, declared that upon a review of Cubit's medical history, he determined that 19 hospital employees who rendered treatment to Cubit were no longer employed by the hospital and could not be located with relative ease. These employees include fourteen nurses, one pharmacist and one lab technician. Mr. Mechtenberg states he believes these individuals possess relevant knowledge of the care and treatment rendered to Cubit while Cubit was at the hospital.

In the abstract it would seem those people involved in Cubit's care would have information concerning his care and treatment in the hospital. How relevant this information might be to the defense, however, is speculative given the nature of plaintiffs' case. Plaintiffs' theory is that given the fact of Cubit's impaired liver, which is clearly documented in the medical records, the prescription of Tylenol in such large doses, which is also documented in the medical records, by defendants constituted negligent medical malpractice. Defendants cannot seriously contend that nurses, pharmacists and lab technicians were responsible for diagnosing and prescribing medication to Cubit. This task is surely left to the treating physicians. None of the named defendants in this case contend the prescription of Tylenol was never made or that the liver, in fact, was never impaired to the point that the administration of Tylenol would not have been a danger. They also do not contend that the medical records did not accurately reflect the test results performed on Cubit as they remember them. It is difficult to imagine what these other 19 "witnesses" might say that could aid the defense.

Furthermore, defendants have not introduced any evidence that these missing 19 people could not be found with reasonable diligence, or that in the one and one-half years since service of the complaint, they have unsuccessfully tried to contact any of these people.

Finally, defendant Ridgecrest contends this court should presume prejudice to defendants because of the three-year delay in service of the complaint.

Cases over the years have held that where there is a protracted delay in prosecuting an action, prejudice may be presumed in the form of lost evidence and faded memories. (*Lopez* v. *Larson, supra,* 91 Cal.App.3d 383; *Dunsmuir Masonic Temple* v. *Superior Court* (1970) 12 Cal.App.3d 17 [90 Cal.Rptr. 405]; *Daley* v. *County of Butte* (1964) 227 Cal.App.2d 380 [38 Cal.Rptr. 693].) These cases involve primarily the situation in which there has been a delay in serving defendants with the complaint.

"Delay in effecting service constitutes a particularly pernicious form of delay in terms of potential prejudice, for the defendant during the period of that delay may be unaware that the action has been filed and thus not alerted to the necessity for making discovery, interviewing witnesses and preserving evidence essential to his defense. Even if witnesses do not become unavailable, their memories of details such as times and dates and the specific words used in critical conversations will fade." (*Lopez* v. *Larson, supra,* 91 Cal.App.3d at pp. 402-403.)

In *Luti* v. *Graco, Inc., supra,* 170 Cal.App.3d 228, the Court of Appeal reviewed a dismissal of an action where the service of a complaint was not effected until almost three years after the complaint was filed. The Court of Appeal confirmed the lower court's ruling that plaintiffs had failed to adequately justify the delay in service. The main issue on appeal, however, was whether defendants were required to prove actual prejudice to be entitled to a dismissal under section 583(a). The *Luti* court discussed in detail the cases holding that prejudice could be inferred or presumed from protracted delay and concluded that the only circumstances under which a court may infer prejudice are those where a delay in service of the summons and complaint is prolonged and unjustified and defendants have no actual knowledge of the existence of the action. (*Luti* v. *Graco, Inc., supra,* at p. 238.) We agree.

A prolonged delay between the filing of the complaint and service, two years eleven months, is present in this case. However, the delay was not unjustified. As explained earlier, plaintiffs presented good cause for the delay between filing and service. Defendants have not cited to a case in which the court inferred prejudice to dismiss a case, where the plaintiffs had shown justification for the delay. These cases discussing the inference of prejudice cite the rule as being that prejudice may be inferred from an *unjustified* and protracted delay in service. (*Lopez* v. *Larson, supra,* 91 Cal.App.3d at p. 401; *Dunsmuir Masonic Temple* v. *Superior Court, supra,*

12 Cal.App.3d at p. 23.) In fact, it would not appear that such a presumption would pass muster under the case law that holds where a plaintiff shows good cause for any delay, the interests of justice are better served by allowing resolution of a case on its merits. (See *Salas* v. *Sears, Roebuck & Co., supra,* 42 Cal.3d at p. 347.) Prejudice cannot be inferred under the facts of this case.

Defendant Ridgecrest contends in its appellate brief that it will suffer actual prejudice in defending the cause of action for intentional spoilage of evidence because of Dr. Ambrosecchia's death. Assuming without deciding that this claim of prejudice would compel the court to grant a dismissal, this argument has been deemed waived on appeal. Ridgecrest's motion for dismissal and supporting declarations did not present this claim of actual prejudice to the trial court, and there was no discussion of this contention at the dismissal hearing.

Finally, defendant Clark's contention that plaintiffs failed to bring him within the ambit of their arguments on appeal must be rejected. Defendant Clark filed a motion before the trial court to join in the Drummond defendants' motion to dismiss. Clark's papers in support of the motion do not include any factual material that would indicate his position requires him to be treated differently than the other defendants. This court can only review the trial court's actions for abuse, taking into consideration the facts before the trial court at the time of the motion. Defendant Clark's motion to dismiss must stand or fall on the evidence he presented below. That evidence being no different than the evidence presented by the other defendants, Clark's motion on appeal is treated in the same manner.

The judgments of dismissal are reversed. Appellants shall recover their costs on appeal.

Woolpert, Acting P. J., and Reid, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied December 16, 1987.

---

* Assigned by the Chairperson of the Judicial Council.