[Crim. No. 3367.    Fourth Dist., Div. Two.    Feb. 28, 1969.]

THE  PEOPLE, Plaintiff  and  Respondent, v.  HARRY
LEROY  CLINE, Defendant and Appellant.

James C. Melli, under appointment by the Court of Appeal,
and Anthony D. Samson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

FOGG, J. pro tem.*—Defendant was indicted by the Riverside County Grand Jury for the crime of murder in violation of section 187 of the Penal Code. After defendant's motion to dismiss the indictment was denied, he pleaded not guilty. Defendant was thereafter tried by the court, defendant and both counsel having waived trial by jury, found guilty of murder in the second degree and sentenced to the state prison for the term prescribed by law. However, execution of the sentence was stayed and defendant was placed on probation for a period of seven years with the condition, inter alia, that he serve one year in the custody of the Riverside County sheriff in an adult detention facility.

On September 26, 1967, the deceased, Arthur Kingswell Bragg, was residing in the Mira Loma area of Riverside County. About 5-5:30 p.m. that evening, he returned to his home from his place of employment, accompanied by his brother-in-law and one Dennis Smith. At approximately 7-7:30 p.m., deceased's brother-in-law left. Shortly thereafter, the defendant, with two companions, arrived and was admitted to Arthur Bragg's residence. During the course of the evening, the conversation centered on the subject of narcotics and dangerous drugs. Defendant indicated that he had acquired some phenobarbital tablets on a recent trip to Indiana and that they were presently in his car. At Bragg's request, defendant went to his car and returned with a tobacco can containing a number of these tablets. Defendant then poured a handful of the tablets into Bragg's hand, which he took into the kitchen. Dennis Smith testified Bragg counted out 37 tablets and swallowed them with the aid of a glass of water. Defendant stated Bragg only counted and consumed 6 tablets. About 30 minutes later, Bragg said he was not getting any response to the pills he had taken. Smith testified defendant then gave Bragg some more, and he counted and took 21 pills, making a total of 58. However, defendant testified that Bragg took only 9 more of the pills previously given to him, or a total of 15. Defendant also testified he told Bragg he would not take more than 6 phenobarbital pills himself because taking that many once made him

*Assigned by the Chairman of the Judicial Council.

sleepy. Officer Bender testified defendant had told him he did not caution Bragg about these pills, and that although he did not remember how many pills Bragg took, there was some mention made of a total of 52. Arthur Bragg subsequently lapsed into unconsciousness later that evening and, on or about September 28, 1967, died from a central nervous system depression caused by bartiburate intoxication.

Dr. Dollinger, a medical doctor specializing in pathology, testified that the consumption within 30 minutes of approximately 50 tablets containing 2 grains of phenobarbital would have caused this death. He also stated that the consumption of phenobarbital in unknown strength would be dangerous to a person's life. Also, the doctor stated, with reasonable medical certainty, that over 10 grains in a dosage of phenobarbital at a single time, or taken during a half-hour period, would be extremely dangerous and would be likely to cause death or serious bodily injury.

Dr. Hessel, a clinical chemist and forensic toxicologist, testified that certain tablets in a tobacco can found by the police where defendant had indicated he had left them, were 2-grain phenobarbital tablets; that he performed certain analytical tests on blood, urine and gastric fluids taken from Bragg's body and found that they contained phenobarbital.

Defendant testified that he knew the tablets were phenobarbital and that he had not obtained them from a licensed pharmacist, doctor or by use of a prescription. However, he also testified that Arthur Bragg had been using dangerous drugs and narcotics for a long time and knew a great deal about the characteristics of such drugs.

Defendant's contentions on appeal may be summarized as follows: (1) The felony-murder doctrine was improperly applied since the furnishing of a dangerous drug without a prescription is not a felony inherently dangerous to human life and did not proximately cause the death of Arthur Bragg; (2) there was no showing that defendant had acted with malice aforethought, and such a showing was necessary because the felony-murder doctrine did not apply to impute malice aforethought.

All kinds of murder other than those specified as first degree are murder of the second degree. (Pen. Code, § 189.) Second degree murder does not require premeditation but, like all murder, it does require malice aforethought. (Pen. Code, § 187.) The felony-murder doctrine imputes malice aforethought to the felon who kills another in the commission

of one of the felonies enumerated in section 189 of the Penal Code. (*People* v. *Jennings*, 243 Cal.App.2d 324, 327 [52 Cal.' Rptr. 329]; *People* v. *Washington*, 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130].) It was enacted to afford the community and its residents protection (*People* v. *Jennings*, *supra*, p. 328) by acting as a deterrent to those felons who might negligently or accidentally kill. (*People* v. *Washington*, *supra*, p. 781.) Although the Penal Code does not expressly set forth any provision for second degree felony murder, the concept lies imbedded in our law. (*People* v. *Phillips*, 64 Cal. 2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353].) The nature and extent of the felony second degree murder doctrine was set forth in *People* v. *Ford*, 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]: ''A homicide that is a direct causal result of the commission of a felony inherently dangerous to human· life (other than the six felonies enumerated in Pen. Code,· § 189) constitutes at least second degree murder.'' However, there can be no deterrent where the felony is not inherently dangerous, since the potential felon will not anticipate that any injury or death might arise solely from the fact that he will commit the felony. (*People* v. *Williams*, 63 Cal.2d 452, 457-458, fn. 4 [47 Cal.Rptr. 7, 406 P.2d 647].)

It has been held that the felony-murder doctrine expresses a highly artificial concept that should not be extended beyond its required application. (*People* v. *Phillips*, *supra*, 64 Cal.2d 574, 582.) Therefore, it must be determined whether a violation of the code provision herein involved constitutes the type of· felony that will permit the use of the felony-murder doctrine. ▮▮▮ Only such felonies as are in themselves ''inherently dangerous to human life'' can support the application of the felony-murder doctrine. In assessing such peril˙ to˙ human life inherent in any given felony, we must not look to the particular facts, but to the elements of the felony in the abstract. (*People* v. *Phillips*, *supra*; *People* v. *Williams*, *supra*, 63 Cal.2d 452, 458, fn. 5.)

▮▮▮ In the instant case, we are concerned with a violation of section 11912 of the Health and Safety Code, which provides: ''. . . every person who . . . imports into this state, . . . furnishes, administers, or gives away . . . any restricted dangerous drug except upon the prescription of a physician . . . shall be punished by imprisonment in the state prison for not less than one year nor more than five years, or by imprisonment in the county jail not exceeding one year.'' Clearly, section 11912 of the Health and Safety Code defines

an offense which can be either a felony or a misdemeanor depending on the sentence imposed. ⬛ The general rule is that prior to judgment an offense which is punishable by imprisonment in the state prison or confinement in the county jail is considered a felony for all purposes. (*Brooks* v. *Superior Court,* 239 Cal.App.2d 538, 542 [48 Cal.Rptr. 762].) Such an offense is and remains a felony until the court sentences a defendant to the lesser punishment and will support a conviction for a felony murder even though there has been no opportunity by way of a separate prosecution for the offense and no occasion or opportunity to impose a sentence or to thus convert the felony into a misdemeanor. (*People* v. *Finley,* 219 Cal.App.2d 330, 340-341 [33 Cal.Rptr. 31].)

⬛ Death resulting from the commission of a felony such as furnishing, selling or administering of narcotics to a minor constitutes second degree murder. (*People* v. *Poindexter,* 51 Cal.2d 142, 149 [330 P.2d 763].) In the *Poindexter* case, it was held that a defendant who furnished or sold heroin to a 20-year-old man [a minor] in violation of former Health and Safety Code, section 11714, resulting in the minor's death, was properly convicted of murder in the second degree. The court said that "there was uncontraverted testimony that Callies [the victim] died from narcotics poisoning, and that taking a shot of heroin was an act dangerous to human life."

⬛ Defendant contends that the mere furnishing of phenobarbital without administering it was not the proximate cause of the death because it was the defendant's own volitional act of consuming the pills that caused his death. However, in *Ureta* v. *Superior Court,* 199 Cal.App.2d 672, 676 [18 Cal.Rptr. 873], it was said by the appellate court in denying a writ of prohibition in a murder prosecution for a death due to pulmonary edema and congestion resulting from morphine poisoning: "It makes no difference whether deceased or another actually injected the narcotic. The person who furnished him the narcotic is liable even though deceased did the actual administering it." *People* v. *Mayfield,* 225 Cal.App. 2d 263 [37 Cal.Rptr. 340], cited by defendant, in support of this contention, is distinguishable because there defendants were copurchasers of the heroin with decedent and did not furnish or administer the drug within the meaning of section 11501 of the Health and Safety Code.

It is true, of course, that phenobarbital is not a narcotic but comes within the definition of "restricted dangerous drugs" under section 11901 of the Health and Safety Code, which

states in part: " 'Restricted dangerous drugs,' . . . means any of the following: (a) 'Hypnotic drug' including . . . barbituric acid derivatives . . . or any compounds or mixtures or preparations that may be used for producing hypnotic effects. . . ." In the case under review, both experts testified that phenobarbital was one of the barbiturates or hypnotics.

The crucial issue that must be resolved in this appeal is, as pointed out by both parties, whether the felony of furnishing a restricted dangerous drug in violation of section 11912 of the Health and Safety Code is inherently dangerous to human life. (*People* v. *Phillips, supra,* 64 Cal.2d 574, 582.)

The trial judge found that defendant's act in furnishing a restricted dangerous drug to the deceased in violation of law was inherently dangerous to human life. His finding in this respect is amply supported by the evidence. It was the uncontroverted testimony of the pathologist that the consumption of phenobarbital in unknown strength was dangerous to human life. There was clear evidence that within a period of one-half hour this drug was consumed in considerable quantity by Bragg in defendant's presence and with his knowledge. Even defendant admitted that the deceased consumed 15 of these pills within one-half hour. It is also significant that the Legislature has defined this type of drug as "dangerous." (Health & Saf. Code, § 11901.) Also in this connection, as indicative of the legislative intent to declare this drug as being dangerous to human life, we find in section 4211 of the Business and Professions Code that " 'Dangerous drug' means any drug unsafe for self-medication," and includes any "hypnotic drug." Section 4211 is a part of that portion of the Business and Professions Code that is incorporated by reference into division 10.5 of the Health and Safety code, which contains sections 11901 and 11912. (*People v. Kesaler,* 250 Cal.App.2d 642, 649 [58 Cal.Rptr. 766].) Furthermore, we note that the same language used in defining a comparable offense relating to narcotics (Health & Saf. Code, § 11501) is found in section 11912. In view of this fact, it was held in *People* v. *Allen,* 254 Cal.App.2d 597, 600-601 [62 Cal.Rptr. 235], that the precedents which have established the elements of crimes involving narcotics are applicable to offenses relating to dangerous drugs.

For all of the foregoing reasons, we conclude that the trial court properly applied the felony-murder doctrine in the case at bench. The defendant committed the felony of furnishing a

restricted dangerous drug without a prescription, an act which was inherently dangerous to human life, directly and proximately causing the death of Bragg. Therefore, the defendant was properly found guilty of murder in the second degree.

The judgment is affirmed.

McCabe, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied March 26, 1969, and appellant's petition for a hearing by the Supreme Court was denied April 23, 1969.