[No. G010516. Fourth Dist., Div. Three. May 21, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK EDWIN TAYLOR, Defendant and Appellant.

## COUNSEL

Jerry L. Steering and Guy N. Webster, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Jeffrey J. Koch and John T. Swan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WALLIN, J.**—Mark Edwin Taylor appealed his second degree murder conviction, based on Adrian Obregon's death arising from Taylor selling him a few dollars' worth of phencyclidine (PCP). We originally reversed, holding the statute upon which Taylor's felony-murder conviction was based (Health & Saf. Code, § 11379.5) could be violated in a manner not inherently dangerous to life. The Supreme Court granted review and retransferred the case here with instructions to vacate our prior opinion and reconsider the case in light of *People* v. *Patterson* (1989) 49 Cal.3d 615 [262 Cal.Rptr. 195, 778 P.2d 549]. We did so, reversed the murder conviction again and re-manded the case for consideration under *Patterson*'s "high probability of death" standard, and affirmed in all other respects. The trial court found the standard had been met, reimposed the judgment, and Taylor appealed again. We affirm in part and reverse in part again.

The facts surrounding Obregon's death have not changed. However, we elaborate on the expert evidence concerning the dangers of PCP because it formed the basis for the trial court's ruling.

Adrian Obregon went to the beach with three friends. On their way, they purchased some beer. On arrival, they swam for a few minutes and drank some of the beer. Witnesses' descriptions of the surf that day ranged from "pretty calm" to "a little big" to "real strong." Obregon was a fairly good swimmer.

Taylor and another person approached the foursome and asked if they wanted to purchase some "water," meaning PCP. Obregon said he did, and he and one of his friends paid Taylor about $2. Taylor dipped an unfiltered cigarette in his vial of PCP. He lit the cigarette, took several puffs, and passed it around. Obregon and his friend took turns smoking the cigarette until it was gone. Obregon and two newcomers smoked another PCP-laced cigarette in this fashion.

After smoking, Obregon sat facing the ocean and listening to the radio with headphones; he was "high." He began scooting toward the water. At the water's edge, he turned around so his head was pointed toward the water. He allowed several waves to hit him and carry him, appearing to enjoy it. A wave broke over him and rolled him onto his stomach; he did not get up. The surf carried Obregon out to sea and neither the lifeguard nor others on the beach could find him.

Obregon's body turned up on the beach the next morning. An autopsy revealed a subdural brain hemorrhage, consistent with an impact against wet sand. Significant amounts of PCP were present in the blood, brain, and liver. The blood-alcohol level was .058 percent. The autopsy surgeon identified the cause of death as saltwater drowning, with PCP use and the subdural hemorrhage as contributing factors.

A complaint charged Taylor with one count of murder, seven counts of sale, furnishing, or transportation of PCP, and one count of possessing PCP for sale. At trial, Dr. Steven Lerner, the prosecution expert, testified that PCP was used experimentally as a general anesthetic in the 1950's. At the normal anesthetic dosage of .25 milligrams per kilogram of body weight, it would render the patient unconscious without medical risk. Vital signs would remain stable. It was discontinued because of side effects, such as assaultive and belligerent behavior in the recovery room.

Ninety to ninety-five percent of PCP users have a pleasant experience. Some chronic users have ingested the drug on a daily basis for years. They build up incredibly high tolerances, up to 250 milligrams per sitting, which is 10 to 15 times the general anesthetic dose for surgery.

Although not familiar with the legal standard, Dr. Lerner testified PCP is inherently dangerous to human life. Although the drug can be toxic, most people who die from the drug do not overdose, but succumb as a result of its "behavioral effects," such as drowning or falls from heights. Users' spatial perceptions are affected; they lose their sense of up and down, and where their limbs are. They can drown in shallow water and are unsafe drivers. The

drug also interferes with their ability to respond appropriately in emergency situations. Users can become violent and have been killed by police as a result. They have also attacked and killed others.

Defense expert Dr. Orm Aniline testified PCP is not a toxic substance by nature, although any substance has some toxic properties depending on how it is used and the sensitivity of the user. PCP was used as an anesthetic because doctors did not need to worry about seizures or cardiac and respiratory problems as they did with other anesthetics. It is still widely used for "headlight surgery" in remote areas because of its high margin of safety, and on animals with sensitive respiratory systems, such as elephants.

PCP is not an inherently dangerous drug; one can be given PCP without creating a substantial risk of death. Concerns about death from an overdose do not arise until an individual has ingested 1,000 milligrams, over 50 times a high street dosage and over 40 times the average anesthetic level. The odds of dying from a dose of PCP are less than 1 in 10,000, and possibly much less. It approximates the risk of death from a shot of lidocaine in the dentist's office.

Dr. Aniline acknowledged there are potential negative side effects to PCP use. It can cause a coma, seizures, neurological problems (including difficulty with balance and movement), respiratory problems, and exacerbation of preexisting conditions (such as heart seizures and psychosis).

Montebello Police Officers[1] Robert Carcano and Louis Ojeda had significant training on PCP and street experience with users. To their knowledge, although approximately 500 to 600 PCP arrests were made in their jurisdiction each year, no "PCP deaths" had ever occurred there.

The trial judge ruled that the sale of PCP is inherently dangerous to human life and allowed the murder charge to go to the jury. Taylor was found guilty on all counts and sentenced to 15 years to life on the murder count, terms being stayed on the companion drug offenses. On appeal, we reversed the murder conviction, reasoning under controlling authority that the felony-murder theory relied upon was invalid because the sale, transportation, or furnishing of PCP was not inherently dangerous to human life when "*viewed in the abstract*." (*People* v. *Taylor* (May 9, 1989) G005345 [nonpub. opn.]; see also *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829-830 [201 Cal.Rptr. 319, 678 P.2d 894]; *People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180].)

The Supreme Court granted review and subsequently transferred the case here with directions to vacate our opinion and to reconsider the matter in

[1]Obregon was from Montebello.

light of *People* v. *Patterson, supra,* 49 Cal.3d 615, decided four months after our opinion was filed. *Patterson* held that to be " 'inherently dangerous' " the underlying felony, viewed in the abstract, must carry " 'a high probability' that death will result." (*Id.* at pp. 622, 627.) We reconsidered the matter with the guidance of *Patterson,* and reversed and remanded to the trial court with instructions to determine whether sale or furnishing of PCP posed a high probability of death. (*People* v. *Taylor* (Sept. 27, 1990) G005345 [nonpub. opn.].) The trial court found it did, relying solely on the expert testimony from the trial.

## I

Before analyzing the trial court's finding that furnishing[2] PCP poses a high probability of death, we must determine the correct standard of review. Neither of the parties tackles the issue, although Taylor seems to treat the issue purely as a matter of law,[3] while the Attorney General seems to view it, at least partially, as an issue of fact.[4] It is the former.[5]

■ "As has often been said, 'A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error. [Citations.]' [Citation.]" (*Atlantic Richfield Co.* v. *State of California* (1989) 214 Cal.App.3d 533, 538 [262 Cal.Rptr. 683].)

However, deference need not always be given to the trial court. For example, statutory interpretation is a question of law (*Dean W. Knight &*

---

[2]Although the statute encompasses importation, transportation, furnishing, administering, sale and giving away of PCP (Health & Saf. Code, § 11379.5, subd. (a)) and the evidence here supported a sale as well as furnishing, we will use the latter term to describe Taylor's conduct and in discussing similar drug statutes unless the context requires otherwise.

[3]Taylor argues, "The trial court's determination . . . was erroneous on its face," and, "[T]he trial court erred in charging the jury on second degree felony murder . . . ."

[4]He concludes, "[The] evidence supported the trial court's ruling."

[5]The dissent asserts that Government Code section 68081 mandates an opportunity for the parties to brief the question of the appropriate review standard. Hardly. The statute only requires such an opportunity when the decision is *"based upon* an issue which was not proposed or briefed by any party . . . ." (Gov. Code, § 68081, italics added.) The decision here is not *based upon* the standard of review; it is based upon the law concerning inherently dangerous felonies. The standard of review merely sets the procedural guidelines for making the decision. Further, the standard of review question is present in *every* case, although the parties often ignore it. The purpose behind section 68081 is to prevent decisions based on issues on which the parties have had no *opportunity* for input. (*Schneider* v. *Kaiser Foundation Hospitals* (1989) 215 Cal.App.3d 1311, 1315, fn. 2 [264 Cal.Rptr. 227].) They certainly had the opportunity here.

*Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d 300, 305 [202 Cal.Rptr. 44]), and appellate courts review such issues independently, at least where there is no conflicting extrinsic evidence offered to aid in interpretation. (See *Atlantic Richfield Co.* v. *State of California, supra*, 214 Cal.App.3d at pp. 538, 542 [appellate court gave deference to trial court's interpretation of statutory language where extrinsic evidence had been offered].)[6]

■ Although second degree felony murder is not expressly set forth in the Penal Code, the courts have long held that certain felonies not listed in Penal Code section 189 (supporting a first degree conviction) will support a finding of second degree murder if a defendant kills during the perpetration of one of them. (*People* v. *Mattison* (1971) 4 Cal.3d 177, 184 [93 Cal.Rptr. 185, 481 P.2d 193].) The courts have limited the bounds of second degree felony murder by limiting the qualifying felonies to those which are "inherently dangerous to human life." (*Ibid.*) Thus, even if the rule lacks a statutory basis (see *People* v. *Dillon* (1983) 34 Cal.3d 441, 472, fn. 19 [194 Cal.Rptr. 390, 668 P.2d 697]; but see *People* v. *Taylor* (1980) 112 Cal.App.3d 348, 356-357 [169 Cal.Rptr. 290] [finding a statutory basis]), the courts' interpretive process is akin to statutory interpretation.

■ One court has held that when the trial court receives extrinsic evidence concerning a statute's meaning, an appellate court will uphold any reasonable construction by it. (*Atlantic Richfield Co.* v. *State of California, supra*, 214 Cal.App.3d at pp. 538, 542 [trial court's interpretation of oil drilling term, "at the well," was reasonable].) However, we do not agree such deference is proper.[7] The *Atlantic Richfield* court forged its rule by stating the general rule on interpreting writings, such as contracts and deeds, contained in Witkin's treatise on California Procedure (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 292-295, pp. 303-306), and applying it to statutory interpretation, without discussion or citation to authority.

This position is at odds with the general proposition that appellate courts independently determine the meaning of statutes. (*Sutco Construction Co.* v. *Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].) Witkin recognizes as much, expressly categorizing statutory interpretation solely as a matter of law, and interpretation of an instrument or writing as a question of law or mixed question of fact and law. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 242, at p. 247.)

---

[6]However, as we discuss below, we disagree that the existence of extrinsic evidence alters the standard of review.

[7]We distinguished *Atlantic Richfield* in *Orange County Employees Assn.* v. *County of Orange* (1991) 234 Cal.App.3d 833, 840-841, footnote 5 [285 Cal.Rptr. 795]. Thus, we had no cause to consider the correctness of its rule.

Further, statutory interpretation does not fit within the definition of mixed questions of law and fact. ■ "Mixed questions are those 'in which the historical facts are admitted or established, *the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard*, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' [Citation.]" (*People* v. *Louis* (1986) 42 Cal.3d 969, 984 [232 Cal.Rptr. 110, 728 P.2d 180], italics added.) ■ Here, it is precisely the rule of law which is disputed: *Viewed in the abstract*, is furnishing PCP an *inherently* dangerous felony carrying a high probability death will result?

This is not the type of question on which appellate courts traditionally defer to the discretion of the trial court, such as change of venue, inconvenient forum, injunction and receivership, and continuances. (See generally, 9 Witkin, Cal. Procedure, *supra*, Appeal, § 276, at pp. 286-287 [illustrating areas of trial court discretion]; see also *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1023, 1025 [213 Cal.Rptr. 712], disapproved on other grounds in *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 479, fn. 4 [243 Cal.Rptr. 902, 749 P.2d 339] [giving further illustrations].) All of those matters are extremely fact intensive and vary from case to case.

The issue of "inherently dangerous felonies" cries out for a uniform rule of law. To paraphrase Cardozo, it would not do to have PCP's "inherent dangerousness" decided different ways among different litigants. (See Cardozo, The Nature of the Judicial Process (1921) p. 33.) The only way to assure uniformity is for the appellate courts to decide the issue as a matter of law, without deference to the trial court's ruling.

Even if we viewed the matter as a mixed question of law and fact, we would independently review the question of inherent dangerousness. In *People* v. *Louis, supra*, 42 Cal.3d 969, the Supreme Court suggested it should independently review the question of due diligence in securing a witness's presence at trial. (*Id.* at p. 988.) In doing so the court engaged in an extensive analysis of the procedure for reviewing mixed questions.

■ " '[T]here are three distinct steps in deciding a mixed fact-law question. The first step is the establishment of the "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators . . . .' " [Citations.] The second step is the selection of the applicable rule of law. The third step—and the most troublesome for standard of review purposes—is the application of law to fact or, in other words, the determination "whether the rule of law as applied to the established facts is or is not violated." [Citation.]' " (42 Cal.3d at p. 985.)

" 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review. The appropriate standard of review for the first

two of the . . . court's determinations—its establishment of historical facts and its selection of the relevant legal principle—has long been settled. Questions of fact are reviewed under the deferential, clearly erroneous standard. [Citation.] Questions of law are reviewed under the non-deferential, de novo standard. [Citations.]' " (42 Cal.3d at p. 985.)

" 'Structurally, appellate courts have several advantages over trial courts in deciding questions of law. First, appellate judges are freer to concentrate on legal questions because they are not encumbered, as are trial judges, by the vital, but time-consuming, process of hearing evidence. Second, the judgment of at least three members of an appellate panel is brought to bear on every case. It stands to reason that the collaborative, deliberative process of appellate courts reduces the risk of judicial error on questions of law. Thus, de novo review of questions of law, like clearly erroneous review of questions of fact, serves to minimize judicial error by assigning to the court best positioned to decide the issue the primary responsibility for doing so. . . . [¶] [Further,] [u]nder the doctrine of stare decisis, appellate rulings of law become controlling precedent and, consequently, affect the rights of future litigants.' " (42 Cal.3d at p. 986.)

" 'The appropriate standard of review for a [trial] judge's application of law to fact may be determined . . . by reference to the sound principles which underlie the settled rules of appellate review just discussed. If the concerns of judicial administration—efficiency, accuracy, and precedential weight—make it more appropriate for a [trial] judge to determine whether the established facts fall within the relevant legal definition, we should subject [the] determination to deferential, clearly erroneous review. If, on the other hand, the concerns of judicial administration favor the appellate court, we should subject the [trial] judge's finding to de novo review. Thus in each case, the pivotal question is [whether] the concerns of judicial administration favor the [trial] court or [whether] they favor the appellate court.' " (42 Cal.3d at pp. 986-987.)

" 'If . . . the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo. [¶] . . . [T]he concerns of judicial administration will generally favor the appellate court, justifying de novo review. This is so because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles.' " (42 Cal.3d at p. 987.)

By that reasoning, we should review de novo the question of inherent dangerousness. Repeatedly, the Supreme Court has expressed the

notion that sound policy reasons require that the second degree felony-murder rule be construed as narrowly as possible. (See, e.g., *People* v. *Patterson, supra,* 49 Cal.3d at p. 622.) The appellate courts are best equipped to fashion the boundaries of the rule and de novo review for that purpose is required.

One might wonder why, if the issue is a question of law to be independently reviewed, the Supreme Court in *People* v. *Patterson, supra,* 49 Cal.3d 615 ordered the matter remanded to the trial court, and why we did the same here. The answer is that the determination of a "high probability of death" depends, at least somewhat, on evidence as to the dangerousness of the underlying felony in the abstract, evidence which is best garnered from testimony by experts. Appellate courts have often used evidence gathered by trial courts and referees as the basis for de novo legal rulings. (See, e.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 219 [233 Cal.Rptr. 404, 729 P.2d 839] [incompetency of counsel]; *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 842 [231 Cal.Rptr. 518, 727 P.2d 711] [defamation]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961] [search and seizure]; *People* v. *Kelly* (1976) 17 Cal.3d 24, 31, 40-41 [130 Cal.Rptr. 144, 459 P.2d 1240] [reversing trial court determination that a scientific process was sufficiently reliable to yield admissible evidence].)

Here, the trial court and prosecution opted to rely upon the expert testimony presented at trial.[8] The court made no determination of credibility or express findings of fact, but merely concluded there was "substantial evidence" that furnishing PCP creates a high probability of death. The only *implied* finding the court might have made was that Dr. Lerner's testimony that PCP is inherently dangerous was correct, and Dr. Aniline's testimony to the contrary was not.[9]

We need not give deference to such a finding because it was not factual. It dealt with the ultimate issue of dangerousness. Although experts are properly allowed to testify on such issues (Evid. Code, § 805), here it is the very issue which this court must decide de novo as a matter of law. Thus, the implied finding, if it was such, is not the type which requires deference. (*People*

---

[8]Taylor asked the trial court to take judicial notice of statistics on PCP deaths and other types of deaths for comparative purposes. The trial court declined, opting to rely on the trial record, and the district attorney did not object to that limitation or seek to produce additional evidence.

[9]Thus, contrary to the dissent's assertion, "the matter we are faced with here" is *not* fact intensive. (Dis. opn., *post,* at p. 1103) The facts of Taylor's case are irrelevant to deciding whether furnishing PCP is inherently dangerous because that question is decided in the abstract. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 622.) We cannot imagine an issue less "fact intensive," as that term has been traditionally and appropriately used.

v. *Louis, supra,* 42 Cal.3d at pp. 986-987.)[10] Any other conclusion would divest appellate courts of the power to interpret the law and place it in the hands of expert witnesses. Using the record provided, we will answer the legal question posed.

## II

None of the cases since *People* v. *Patterson, supra,* 49 Cal.3d 615 have decided whether furnishing PCP (or any drug) carries a high probability of death. (See *People* v. *Coleman* (1992) 5 Cal.App.4th 646 [7 Cal.Rptr.2d 40] [kidnapping for robbery; high probability of death]; *People* v. *Morse* (1992) 2 Cal.App.4th 620, 646 [3 Cal.Rptr.2d 343] [reckless or malicious possession of a bomb; high probability]; *People* v. *Lee* (1991) 234 Cal.App.3d 1214, 1228-1229 [286 Cal.Rptr. 117] [child endangerment; not inherently dangerous]; *People* v. *Pearch* (1991) 229 Cal.App.3d 1282, 1299 [280 Cal.Rptr. 584] [kidnapping; high probability]; *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1228 [277 Cal.Rptr. 382] [kidnap for ransom; high probability].) However, a number of pre-*Patterson* cases dealt with the issue, often with little analysis.

In *People* v. *Poindexter* (1958) 51 Cal.2d 142 [330 P.2d 763], a case credited with presaging the announcement of the second degree felony-murder rule (*People* v. *Satchell* (1971) 6 Cal.3d 28, 35-36 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]), the Supreme Court held furnishing heroin to a minor who died as a result supported a second degree murder conviction. (*Id.* at p. 149.) The court reasoned, "[There] was uncontroverted testimony that [the minor] died from narcotics poisoning, and that taking a shot of heroin was an act dangerous to human life." (*Ibid.*)

*Ureta* v. *Superior Court* (1962) 199 Cal.App.2d 672 [18 Cal.Rptr. 873] relied on *Poindexter,* and held that death from injected morphine poisoning establishes the corpus delicti for murder because one might reasonably infer the morphine was illegally furnished. (*Id.* at p. 676.) Without analysis or citation to authority, the court stated, "It makes no difference whether deceased or another actually injected the narcotic. The person who furnished him the narcotic is liable even though deceased did the actual administering of it." (*Ibid.*)

*People* v. *Mayfield* (1964) 225 Cal.App.2d 263 [37 Cal.Rptr. 340] distinguished *Poindexter* and *Ureta,* and held the defendant, who aided and

---

[10]Another reason for refusing to give deference to any implied finding regarding the experts' conclusions is they did not deal with the precise question presented here. Both testified on whether PCP is inherently dangerous without reference to the *Patterson* "high risk of death" standard, and Dr. Lerner admitted he was unfamiliar with the legal standard for inherent dangerousness.

abetted, by his copurchase, a self-administration of heroin resulting in death, could not be convicted of felony murder. (*Id.* at pp. 266-268.) However, the court apparently based its holding on its conclusion that the copurchasers would be guilty, at most, of misdemeanor use of drugs. (*Ibid.*; see also *People* v. *Cline* (1969) 270 Cal.App.2d 328, 332 [75 Cal.Rptr. 459, 32 A.L.R.3d 582] [interpreting the holding in *Mayfield*].)

In *People* v. *Williams* (1965) 63 Cal.2d 452 [47 Cal.Rptr. 7, 406 P.2d 647] the Supreme Court held that conspiracy to possess methedrine was not inherently dangerous. (*Id.* at p. 458.) In doing so, the high court held for the first time that the felony in question must be viewed in the abstract. (*Id.* at p. 458, fn. 5.) Therefore, it ignored the facts of the stabbing in making its determination on inherent dangerousness. (*Id.* at pp. 454-455, 458.)

The court in *People* v. *Cline, supra,* 270 Cal.App.2d 328 relied on the bald statement in *Ureta* v. *Superior Court, supra,* 199 Cal.App.2d 672 that no distinction should be made between administering and furnishing a drug. (*People* v. *Cline, supra,* 270 Cal.App.2d at p. 332.) The court held furnishing phenobarbital was an inherently dangerous felony, ignoring the then-recent "felony in the abstract" rule of *People* v. *Williams, supra,* 63 Cal.2d 452. (*People* v. *Cline, supra,* 270 Cal.App.2d at p. 333.)

The *Cline* court reasoned as follows: "The trial judge found that defendant's act in furnishing a restricted dangerous drug to the deceased in violation of law was inherently dangerous to human life. His finding in this respect is amply supported by the evidence. It was the uncontroverted testimony of the pathologist that the consumption of phenobarbital in unknown strength was dangerous to human life. There was clear evidence that within a period of one-half hour this drug was consumed in considerable quantity by [the victim] in defendant's presence and with his knowledge. Even defendant admitted that the deceased consumed 15 of these pills within one-half hour." (270 Cal.App.2d at p. 333.) The court also looked to legislative intent to declare the drug "dangerous to human life." (*Ibid.*) It relied upon "all of [these] reasons" to find second degree felony murder was supported by furnishing a restricted dangerous drug without a prescription. (*Id.* at pp. 333-334.)

Despite the *Cline* court's reliance upon the facts of the case and legislative intent to reach its result, the court in *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697] cited *Cline* as authority for the proposition that furnishing drugs is inherently dangerous in the abstract. (*Id.* at p. 59.) The *Taylor* court noted that *Cline* "cited [*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353] [reiterating the 'abstract' rule] and the

Supreme Court denied a hearing." (*People* v. *Taylor*, *supra*, 11 Cal.App.3d at p. 59.)

Without protracted discussion or dispute, *People* v. *Mattison*, *supra*, 4 Cal.3d 177, 185-186 and *People* v. *Calzada* (1970) 13 Cal.App.3d 603, 605-606 [91 Cal.Rptr. 612] added administering methyl alcohol and driving under the influence of narcotics, respectively, to the list of inherently dangerous drug-related felonies. Then came the second *People* v. *Taylor*, *supra*, 112 Cal.App.3d 348. Relying without analysis on *Mattison*,[11] *Poindexter*, *Taylor*, *Cline*, and *Ureta*, the court rejected the argument that administering heroin is necessary for application of the felony-murder rule, and held furnishing was sufficient. (*Id.* at p. 358.) Finally, in *People* v. *Edwards* (1985) 39 Cal.3d 107 [216 Cal.Rptr. 397, 702 P.2d 555], the Supreme Court alluded to the second *Taylor* and *Cline*, but based its reversal on the failure to instruct that the defendant might escape culpability if he merely aided or abetted a purchase of heroin, relying on *People* v. *Mayfield*, *supra*, 225 Cal.App.2d 263. (*People* v. *Edwards*, *supra*, 39 Cal.3d at pp. 113-116.)

Two notable observations can be made about these "drug related" second degree felony-murder cases. The first is obvious: By predating *People* v. *Patterson*, *supra*, 49 Cal.3d 615, none of the cases used the *Patterson*'s "high probability of death" standard. Second, although *People* v. *Taylor*, *supra*, 11 Cal.App.3d 57 paid lip service to the need to look at the felony in the abstract (*id.* at p. 59), none of the cases actually performed an analysis of drug furnishing from that vantage point.[12] As we shall discuss, these omissions yielded an improper conclusion.

While the "drug related" second degree felony-murder cases were evolving, other cases adhered to the rule that inherent dangerousness must be viewed in the abstract. (*People* v. *Patterson*, *supra*, 49 Cal.3d at p. 625; *People* v. *Burroughs*, *supra*, 35 Cal.3d at pp. 830-832 [practicing medicine without a license; not inherently dangerous]; *People* v. *Henderson*, *supra*, 19 Cal.3d at pp. 93-96 [false imprisonment; not inherently dangerous]; *People* v. *Satchell*, *supra*, 6 Cal.3d at pp. 36-41 [firearm possession by felon; not inherently dangerous]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 51-52 [98 Cal.Rptr. 44, 489 P.2d 1372] [escape from penal facility; not inherently dangerous]; *People* v. *Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673] [auto arson; inherently dangerous]; *People* v. *Phillips* (1966)

---

[11]The court's citation to *People* v. *Mattison*, *supra*, 4 Cal.3d 177 is surprising. The *Mattison* court discussed the first *People* v. *Taylor*, *supra*, 11 Cal.App.3d 57, but did so in an unrelated context. (*People* v. *Mattison*, *supra*, 4 Cal.3d at pp. 184-186.)

[12]Perhaps the Attorney General recognized these facts. He does not cite any pre-*Patterson* cases in support of his argument on the issue of inherent dangerousness.

64 Cal.2d 574, 582-584 [51 Cal. Rptr 225, 414 P.2d 353] [grand theft; not inherently dangerous].) Of these cases, four give particular insight into application of the "abstract" rule.

*Patterson* itself expressly distinguished furnishing from administering for analyzing "inherent dangerousness." (*People* v. *Patterson, supra,* 49 Cal.3d at pp. 624-625.) In *People* v. *Burroughs, supra,* 35 Cal.3d 824, the Supreme Court pointed out that the statute making the unlicensed practice of medicine a felony included circumstances where there was a risk of great bodily harm, serious mental or physical illness, or death. (*Id.* at p. 830.) Although the other conditions could involve a great risk of death under certain circumstances, the court held the felony would not support second degree murder because in the abstract, the statute *could* be violated without such risk. (*Id.* at pp. 830-831, 833.)

Similarly, in *People* v. *Henderson, supra,* 19 Cal.3d 86, the court reasoned that false imprisonment by fraud and deceit carried no great risk of death, and declined to focus on violent means of violating the statute. (*Id.* at pp. 93-95.) And, in *People* v. *Lopez, supra,* 6 Cal.3d 45, the court refused to consider the *possibility* of violent resistance in determining whether escape is inherently dangerous. (*Id.* at pp. 51-52.)

██ We apply this wisdom to Taylor's crime. Pursuant to the mandate of *People* v. *Patterson, supra,* 49 Cal.3d 615, we look only to the offense he committed within the purview of Health and Safety Code section 11379.5, sale or furnishing of PCP (at p. 625), and ask whether it inherently carries a " 'high probability' " of death (*id.* at p. 627). However, to answer the question we must ask what the term means.[13]

Like the trial court, we do not understand the term "high probability" to mean greater than 50 percent. Very few activities in life, even noncriminal conduct, carry such a risk. And, for two reasons, we eschew relying solely on statistical comparisons of death rates from furnishing PCP and those involving furnishing other drugs or noncriminal activities such as driving, boating, and hang gliding.

---

[13]We do not take Chief Justice Lucas's statement that the standard could virtually never be met in a drug-furnishing case as an invitation to throw up our hands and abandon any try at analyzing the issue. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 628 (conc. and dis. opn. of Lucas, C. J.).)

First, we have been presented with no such statistical analysis. Neither Dr. Lerner nor Dr. Aniline used such an approach.[14] Second, courts have hesitated to turn the law into a pure statistical analysis. (See, e.g., *People* v. *Collins* (1968) 68 Cal.2d 319, 320, 327, 329-332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)[15]

However, a "high probability" is apparently greater than a " 'substantial risk.' " (*People* v. *Patterson, supra,* 49 Cal.3d at pp. 628-629 (conc. and dis. opn. of Lucas, C. J.) Because these terms lack analytical precision, we look to implied malice cases for guidance. Implied malice, which *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279] instructs must involve a high probability of death, has been found where the defendant: shot at a cup the victim was holding in front of her face (*People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1]); initiated a gun battle (*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130]); used a robbery victim as a shield (*Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 136 [145 Cal.Rptr. 524, 577 P.2d 659]); and drove drunk at high speeds through city streets (*People* v. *Watson, supra,* 30 Cal.3d at pp. 300-301.) Thus, imminent deadly consequences must be inherent in the act.

Viewed in this context, furnishing or selling PCP does not carry a high probability of death in the abstract. Merely conveying the drug to another does not require that it be consumed; completion of the crime does not depend upon consumption.[16] And, unlike a live explosive (see *People* v. *Morse, supra,* 2 Cal.App.4th 620), mere possession of PCP is not inherently dangerous.

---

[14]Dr. Aniline did say the chances of dying from an overdose were less than 1 in 10,000. He did not opine about the odds of dying from other causes while high on PCP. Taylor asked us to take judicial notice of the statistics provided in his opening brief concerning death rates for PCP and various travel and recreational activities, and the Attorney General voiced no opposition. But Taylor provided no scientific analysis, of which we also might take judicial notice, concerning the statistical import of those numbers.

[15]We also opt not to consider the testimony of the Montebello police officers. It is historically interesting, but we do not give it weight in our analysis because it does not purport to involve a statistically reliable or significant sample. Although the outcome should not be based solely on statistics, neither should it be based upon isolated incidents which lack any statistical context.

[16]The dissent urges "plain, ordinary common sense" tells us the drug will always be consumed. (Dis. opn., *post,* at p. 1105.) One need only read the newspapers about the tons of contraband seized by law enforcement every year to know that is not true. Nonetheless, we do not dispute that furnished drugs are usually consumed. However, the dissent seems to miss the thrust of viewing the underlying felony in the abstract. We reiterate: The question is not what happened in this case or what *usually* happens. The question is whether the statute *can* be violated in a nondangerous (or less than high-probability-of-death) fashion. (See, e.g., *People* v. *Henderson, supra,* 19 Cal.3d at pp. 93-95 [false imprisonment *can* be committed by fraud and deceit].) The dissent turns this rule on its head and hypothesizes a worst case scenario of toxic dermal osmosis. (Dis. opn., *post,* at pp. 1105-1106.)

Even when consumed, PCP does not carry a high probability of death. It is almost impossible to overdose on it. Although Dr. Lerner related a great number of particular instances where ingestion of PCP led to tragic consequences, he did not suggest that such outcomes were inevitably imminent whenever any amount of PCP is ingested. Indeed, his testimony suggests the vast majority of users, 90 to 95 percent, do not suffer any untoward effects on any given occasion. The chronic users taking heavy doses of the drug are the ones who most frequently meet untimely demises.[17] Furnishing or selling PCP, *when viewed in the abstract,* does not carry with it an inherently high probability of death.

By saying this, we do not condone the sale or use of illegal drugs in any amount. *Some* risk of death is always present. As usage continues, the probability of adverse consequences rises. And these consequences are not always death. Drug and alcohol abuse ruins untold lives of users and their loved ones. Relationships and job performance suffer from an activity that has no social utility. These are but a few of the reasons for drug laws, education concerning the danger of drug use, and other social measures aimed at ameliorating this serious problem.[18]

However, we decline to act as a superlegislature and enact the crime of murder for those rare and ofttimes strange instances when death results from

---

[17]Dr. Lerner's testimony was as follows: "A. Probably 90 to 95 percent of people that use PCP have pleasurable experiences. However, in the chronic users we've studied, if you follow them longitudinally over a long enough period of time, all of them uniformly talk about what they would consider problems with the drug, where either they have—they've been bizarre, unusual or violent in their behavior toward others. . . . [¶] Q. Are you saying then it's okay to take one or two puffs off a PCP cigarette as long as you don't use it again? [¶] A. No, not at all. Because depending on whether you take those one or two puffs, you could either put you own life in jeopardy, if you're at the ocean or the beach, near a body of water. If you take one or two puffs and you happen to be in an automobile, you're clearly putting everyone around you, their life in jeopardy by smoking because your driving abilities are compromised. [¶] Q. That is whether you're a chronic user or not? [¶] A. Makes no difference."

This testimony shows that PCP can be dangerous *in particular circumstances,* and no prudent person should ingest it. But Dr. Lerner's opinion is far from saying all PCP use in the abstract inevitably carries a high probability of death. Although he pointed out that potential danger exists when any amount is consumed, his scenarios ending in death involved chronic users.

[18]The dissent, seizing on the *prosecution* expert's use of the term "pleasurable" to describe user's experiences, implies we are drug use apologists, seeking to dilute the risk of drug use by touting the good times it purportedly engenders. We do not. Recreational drug use has no social utility. Our society has paid a high price for the experimentation of prior years. We have expressed that concept in the preceding paragraph and stress it here. The dissent's innuendo to the contrary is unfortunate and diverts us from our task to dispassionately apply the law. Our colleague's position on this case is puzzling. When the case was before the court in 1989 and the trial court had found furnishing PCP was inherently dangerous *using the same evidence* it later used to rule after the latest remand, our colleague "concur[red] in the judgment under the compulsion of *People v. Burroughs* . . . ." (*People v. Taylor, supra,* (May 9, 1989) G005345 (conc. opn. of Moore, J.).) Now that the case is before us with the same

furnishing PCP.[19] Although we recognize the viability of the felony-murder rule, we adhere to the steady commitment of our courts to avoid " ' "extension [of the rule] beyond its required application." ' " (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 829.)

The judgment is reversed as to the conviction for second degree murder. The superior court is directed to dismiss the murder count. Within 30 days after the opinion becomes final, the district attorney may amend the information to include a count of involuntary manslaughter. If he does not do so, the total sentence is modified to five years. In all other respects, the judgment is affirmed.[20]

Sonenshine, J., concurred.

**MOORE, Acting P. J.,** Dissenting.—I dissent from the majority's holding that furnishing phencyclidine (PCP) is not an inherently dangerous felony for purposes of second degree felony murder.[1] Based on a combination of reasoning a fellow colleague recently characterized as prestidigitation,[2] reliance on the now discredited decision in *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019 [213 Cal.Rptr. 712],[3] and a misstatement of the holdings in several Supreme Court decisions, the majority concludes, using

factual basis but a more stringent requirement for inherent dangerousness (*People* v. *Patterson, supra,* 49 Cal.3d at p. 628 (conc. and dis. opn. of Lucas, C. J.)), he dissents.

[19]The present case is a good example of the rather fortuitous circumstances under which a death may occur. Although Dr. Lerner testified that PCP users are attracted to water, he related no other instances in which a user had been swept to a death at sea. Another example would be if we were to find that furnishing codeine without a prescription was inherently dangerous. (See Health & Saf. Code, §§ 11054, subd. (c)(4) and (5), and 11352, subd. (a).) A person giving a friend with a severe headache Tylenol-3 resulting in a deadly allergic reaction could be sent to prison for 15 years to life. (Pen. Code, § 190, subd. (a).)

[20]Taylor raises no issues relating to his other convictions. Our reversal on the murder count renders his other contentions moot.

[1]I also question whether the majority's opinion meets the standards for publication found in California Rules of Court, rule 976. The parties agreed in the trial court to submit the issue of whether furnishing PCP is inherently dangerous on the testimony of the two expert witnesses at trial. While I do not mean to slight either, I believe any court called upon to rule on such an important issue must be satisfied there was a full complement of expert opinion before any such decision is rendered in a published opinion. I do not believe this was the case here. Moreover, the majority picks and chooses what it requires to reach its result, giving credence to defendant's expert and rejecting the People's expert in some instances and even ignoring the testimony of both in others. As such, the majority's contribution to the legal literature is of dubious import.

[2]See Presiding Justice Sills' dissenting opinion in *People* v. *Stoltz* *(Cal.App.).

[3]The majority relies on *Hurtado* v. *Statewide Home Loan Co., supra,* 167 Cal.App.3d 1019, to support the use of de novo review in this case. *Hurtado* was expressly overruled by *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474 [243 Cal.Rptr. 902, 749 P.2d 339], insofar as it

*Reporter's Note: Opinion (G008692) deleted upon direction of Supreme Court by order dated April 16, 1992.

its own philosophical point of view, that furnishing PCP is not a felony inherently dangerous to human life, thereby rendering remand to the trial court for a determination of the same question a complete waste of time and judicial resources. In my opinion the majority's reasoning and result are ludicrous.

A critical issue in this case is the standard of review to be applied. The majority spends most of its time and effort determining that the proper standard is de novo review. Yet, as is acknowledged, neither party raised nor addressed this issue in their briefs. Therefore, I believe under Government Code section 68081[4] this court will ultimately have to grant a rehearing in order to allow the parties to brief the issue.

Since it is clear the majority has an inaccurate understanding of the rules governing appellate review, I start with a summary of the applicable general principles. First, we *always* begin with the presumption that the judgment of the lower court is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Walling v. Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58]; *People v. One Parcel of Land* (1991) 235 Cal.App.3d 579, 583 [286 Cal.Rptr. 739]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, pp. 276-277.) Regardless of the standard of review employed, it is the *appellant's* obligation to establish that *legal error* occurred and that it was prejudicial to his or her cause. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932]; *In re Kathy P.* (1979) 25 Cal.3d 91, 102 [157 Cal.Rptr. 874, 599 P.2d 65]; *Tupman v. Haberkern* (1929) 208 Cal. 256, 263 [280 P. 970]; *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562,

---

held an appellate court need not defer to the trial court's factual determinations based on written declarations. (*Id.* at p. 479, fn. 4.) In addition, several appellate courts, including this division, have noted *Hurtado*'s holdings that a trial court's exercise of discretion is subject to plenary appellate scrutiny and that actual prejudice must be shown to support a discretionary dismissal under Code of Civil Procedure section 583.420, are contrary to other Supreme Court decisions and have declined to follow them. (*Wong v. Davidian* (1988) 206 Cal.App.3d 264, 268-269 [253 Cal.Rptr. 675] [standard of review]; *County of Los Angeles v. Superior Court* (1988) 203 Cal.App.3d 1205, 1210 [250 Cal.Rptr. 481] [prejudice]; *Schumpert v. Tishman Co.* (1988) 198 Cal.App.3d 598, 605 [243 Cal.Rptr. 810] [prejudice]; *Clark v. Stabond Corp.* (1987) 197 Cal.App.3d 50, 55, fn. 3 [242 Cal.Rptr. 676] [standard of review]; *Freedman v. Pacific Gas & Electric Co.* (1987) 196 Cal.App.3d 696, 704 [242 Cal.Rptr. 8] [standard of review]; *Cubit v. Ridgecrest Community Hospital* (1987) 194 Cal.App.3d 1552, 1565-1566 [240 Cal.Rptr. 346] [standard of review]; *San Ramon Valley Unified School Dist. v. Wheatley-Jacobsen, Inc.* (1985) 175 Cal.App.3d 1050, 1054-1055 [221 Cal.Rptr. 342] [standard of review].)

[4]That section reads: "Before the Supreme Court, a court of appeal, or the appellate department of a superior court renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party."

575 [187 Cal.Rptr. 200]; *Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 712 [152 Cal.Rptr. 65]; 9 Witkin, *op. cit. supra*, § 325, at pp. 335-336.)

Of course, the appropriate standard of review will vary from case to case. Where an appellant challenges the sufficiency of the evidence to support the lower court's ruling we decide whether substantial evidence supports the judgment. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 528 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 562, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In others, such as the interpretation of statutes or contracts where no conflicting extrinsic evidence has been presented, the question is one of law and we are not bound by the trial court's construction. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; 9 Witkin, *supra*, § 242, at pp. 247-249.) A third approach is the abuse of discretion standard. (*Shamblin* v. *Brattain, supra*, 44 Cal.3d 474, 478-479; 9 Witkin, *supra*, Appeal, § 275, p. 286.)

But in some cases, such as the present one, an appellate court is presented with a mixed question of law and fact.

"[T]he concerns of judicial administration—efficiency, accuracy, and precedential weight—make it more appropriate for a [trial] judge to determine whether the established facts fall within the relevant legal definition, [and] we should subject his determination to deferential, clearly erroneous review." (*People* v. *Louis* (1986) 42 Cal.3d 969, 986-987 [232 Cal.Rptr. 110, 728 P.2d 180].) As *Louis* points out, the key to determining the standard of review that should be applied when mixed questions of law and fact are presented is to choose the standard under which the concerns of judicial administration will best be furthered. (*Ibid.*) "If application of the rule of law to the facts requires an inquiry that is 'essentially factual,' [citation]—one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,' [citation]—the concerns of judicial administration will favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard." (*Id.* at p. 987, quoting *United States* v. *McConney* (9th Cir. 1984) 728 F.2d 1195, 1200-1203, fns. omitted.)

The majority cites authority for the proposition that an appellate court's deferral to trial court discretion is appropriate only in matters which are "extremely fact intensive. . . ." (Maj. opn., *ante*, p. 1092.) But, the matter we are faced with here *is* fact intensive. Two expert witnesses testified, one for the prosecution and one for the defense, and each rendered a markedly different opinion as to the ultimate issue of whether furnishing PCP is inherently dangerous. Much scientific and anecdotal evidence was cited in

support of each opinion. This necessitated the trier of fact, here the court, to weigh the testimony and the relative credibility of each witness in arriving at a decision. *"Where the evidence is in conflict, the appellate court will not disturb . . . the findings of the trial court.* The presumption being in favor of the judgment [citation], the court must consider the evidence in the light *most favorable* to the *prevailing party*, giving him the benefit of *every reasonable inference* and *resolving conflicts* in support of the judgment." (9 Witkin, *supra*, Appeal, § 278, at p. 289.)

Here, resolution of the conflicting expert testimony was an essential predicate to a determination of whether furnishing PCP creates a high probability of death and was a task best suited for the trial court. But, the majority attempts to sidestep these issues of fact and a presumption in favor of the judgment by finding that since both experts rendered an opinion regarding the ultimate issue in this case, neither opinion need be given deference. The majority then contradicts itself by stating that the experts' conclusions did not deal with the precise question presented upon remand. (Maj. opn., *ante*, pp. 1094-1095.) This is illustrative of the majority's efforts to avoid having to characterize any of the findings made by the trial court as factual. However, notwithstanding the majority's opinion to the contrary, I believe the evidence here did present questions of fact which were resolved by the trial court. One expert testified PCP was inherently dangerous and one testified it was not. Each gave reasons for their opinions and placed their credibility in issue, and it was the trial court who was in the best position to judge credibility. (9 Witkin, *supra*, Appeal, § 278, at pp. 289-291.)

It is true that both questions of fact and law were presented. The issue of whether furnishing a substance can support a conviction for second degree murder is one of law. However, it is now settled the answer to that question is yes, if the substance that is furnished is one which is inherently dangerous to human life. Numerous cases have upheld convictions for second degree felony murder based upon the furnishing of dangerous drugs. Although these pre-*Patterson* cases (*People v. Patterson* (1989) 49 Cal.3d 615 [262 Cal.Rptr. 195, 778 P.2d 549]) apply the "substantial risk to human life" standard[5] instead of the "high probability [of] death" standard, they represent almost universal acceptance of the inherent dangerousness of furnishing dangerous drugs under the law as it existed prior to *Patterson*. The two standards appear to be different, but no case has seen fit to explain exactly how or to what

[5]This was the standard which preceded *Patterson* and can be found in *People v. Burroughs* (1984) 35 Cal.3d 824, 833 [201 Cal.Rptr. 319, 678 P.2d 894].

degree they are so. Assuming that they are,[6] "The task of evaluating the evidence on this issue is most appropriately entrusted to the trial court, subject, of course, to appellate review." (*People* v. *Patterson, supra,* 49 Cal.3d at p. 625.) We should defer to the trial court's ruling unless patently erroneous.

Instead, the majority ignores the trial court's findings, and opines that "Merely conveying the drug to another does not require that it be consumed . . . ." (Maj. opn., *ante,* at p. 1099.) However, such a statement defies experience. When one furnishes an illicit drug to another, it is with the realization that the drug will ultimately be consumed, if not by the buyer then by someone else. It does not take an expert to confirm this—just plain, ordinary common sense.

Oddly, the majority seems to inversely correlate the inherent dangerousness of PCP with the pleasure it induces in the vast majority of users. (Maj. opn., *ante,* at p. 1099, fn. 14.) If the determination of a drug's inherent dangerousness were dependent on whether it provides pleasure, most prohibited narcotics would have to be deemed inherently *not* dangerous since they presumably provide subjectively pleasurable sensations. It is the pleasure which fuels their demand. But for the pleasure, demand would cease, and thousands of drug dealers would join the rolls of the unemployed. And, though fatalities associated with PCP use may not be directly caused by ingestion of the drug, but instead from its hallucinogenic effects, this is no less a reason to determine that furnishing PCP carries a high probability of

---

[6]There is an odd juxtaposition in recent case law between the distinct crimes of second degree implied malice murder and second degree felony murder. The latter requires the commission of an underlying felony which is "inherently dangerous to human life." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) *Patterson* interprets this phrase as requiring the commission of a felony which carries " 'a high probability' that death will result." (*People* v. *Patterson, supra,* 49 Cal.3d 615, 627.) *Patterson* arrives at this conclusion by analogizing to implied malice murder, which requires the commission of "an act, the natural consequences of which are dangerous to life." (*People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279]; see also *People* v. *Patterson, supra,* at pp. 626-627.) In *People* v. *Dellinger* (1989) 49 Cal.3d 1212 [264 Cal.Rptr. 841, 783 P.2d 200], the Supreme Court held that the "dangerous to life" definition of implied malice murder articulates the same standard as the "high probability [of] death" standard. (*Id.* at pp. 1218-1219.) Of course, the crime in *Dellinger* was implied malice murder, not second degree felony murder. Nonetheless, *Dellinger* clearly holds that the phrase "dangerous to life" has the same meaning as the phrase "high probability [of] death."

We must also remember that the Supreme Court has previously equated "dangerous to life," in the context of second degree felony murder, with "substantial risk to human life." (*People* v. *Burroughs, supra,* 35 Cal.3d at p. 833.) The *Burroughs* standard ("substantial risk to human life") sounds less stringent than the *Patterson* standard ("high probability [of] death"). But how can this be if, according to *Dellinger,* the *Patterson* standard means the same as, and is no more stringent than, the "dangerous to life" standard? I hope the Supreme Court will clarify this apparent conundrum.

death. The majority's analogy to a potentially fatal allergic reaction from codeine is absurd; such allergic reactions are uncommon with codeine consumption. But disorientation, muscular inability, hallucinations, spatiotemporal confusion and other potentially dangerous symptoms are common in PCP intoxication. To view these effects as distinct from the drug itself is asinine.

Moreover, the drug is not inert and harmless when not being used. It can permeate through plastic and other packaging materials, can be absorbed through the skin by handling, and its vapors can be inhaled when it is nearby. It is thus capable of causing the aforementioned symptoms in a person who may have no intent to ingest the drug.

I would find substantial evidence supports the trial court's determination that furnishing PCP is an inherently dangerous felony.

Respondent's petition for review by the Supreme Court was denied August 13, 1992. Panelli, J., Baxter, J., and George, J., were of the opinion that the petition should be granted.